## OPINION OF THE JUSTICES TO THE SENATE.

*Supreme Judicial Court,* Superintendence of inferior courts. *Judge. Constitutional Law,* Separation of powers, General Court, Judiciary. *General Court. Judiciary.*

Proposed legislation designating the Chief Justice of the Supreme Judicial Court as the executive head of the judicial system and conferring on him certain administrative duties and responsibilities would not violate art. 29 of the Declaration of Rights, provided that the Chief Justice does not exercise powers inherent in the full court. [887-891]

Proposed legislation authorizing the Chief Justice of the Supreme Judicial Court "to revise or abolish such divisions of the superior or district court as he deems the sound administration of justice requires" would not constitute an invasion of the legislative power in violation of Part I, art. 30, of the Massachusetts Constitution. [891-896]

Certain provisions in proposed legislation which would permit the Chief Justice of the Supreme Judicial Court to transfer or authorize the transfer of criminal cases from one county to an adjoining county would not contravene art. 13 of the Declaration of Rights. [896-898]

Proposed legislation authorizing and requiring the Chief Justice of the Supreme Judicial Court to appoint a court administrator would not violate art. 29 of the Declaration of Rights, provided that the administrator does not exercise powers inherent in the full Supreme Judicial Court. [898-899]

Proposed legislation directing that the judge of the Land Court, the chief judge of the Probate Courts, and the judges of the Housing Courts shall become associate justices of the Superior Court consequent to the merger of those courts with the Superior Court would not result in a demotion of the judges in violation of Part II, c. 3, art. 1, as amended by art. 98 of the Amendments to the Massachusetts Constitution. [899-904]

The transfer of judges under proposed legislation providing that all justices and special justices of the Municipal Courts, Juvenile Courts, and existing District Courts shall become justices and special justices of the reconstituted District Court and directing that the judge and associate judges of the Land Court, the chief judge, judges, and special judges of the Probate Courts, and the judges of the Housing Courts shall become associate justices of the Superior Court would not violate the Constitutional authority of the executive department to appoint and commission judges nor abridge the constitutionally protected tenure rights of the transferred judges. [904-909]

The mere fact that the Massachusetts Constitution makes reference to Probate Courts does not preclude the Legislature from merging the Probate Courts into the Superior Court. [909-911]

On May 31, 1977, the Justices submitted the following answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit their answers to the questions set out in an order adopted by the Senate on March 7, 1977, and transmitted to us on March 11, 1977.

Pending before the General Court is a bill, House No. 4400, entitled, "An Act relative to the organization, management and financing of the judicial system." Transmitted with the order was a copy of the bill which, the order recites, "seeks to substantially reorganize the structure, management and financing of the judicial system of the commonwealth; and ... to effect major changes affecting the various courts, the jurisdiction of said courts and the duties of the judges of said courts and the management of all other court personnel...." The order further recites that serious doubts exist as to the constitutionality of certain parts of the bill if enacted into law.

The opinions of the Justices are requested as to the following questions:

"1. Does section 2A of chapter 211 of the General Laws, as appearing in section 781 of said bill, violate part 1, article 29 of the Constitution by vesting in the chief justice of the supreme judicial court those powers which part 1, article 29, vests in the supreme judicial court as a whole?

"2. Does the second paragraph of section 2A of chapter 211 of the General Laws, as appearing in section 781 of said bill, which intends to empower the chief justice of the supreme judicial court to revise or abolish such divisions of the superior or district court as he deems the sound administration of justice requires constitute an invasion of the legislative power in violation of part 1, article 30 of the Constitution?

"3. Do the fourth and fifth paragraphs of section 2A of chapter 211 of the General Laws, as appearing in sec-

tion 781 of said bill, which intends to empower the chief justice of the supreme judicial court to transfer and authorize the transfer of any cases or matters from the superior court of one county to an adjoining county or of any cases or matters from one division of the district court to another division of the district court contravene the provisions and intent of article 13 of the Declaration of Rights of the Constitution as to venue of criminal prosecutions?

"4. Does section 3A of chapter 211 of the General Laws, as appearing in section 783 of the said bill, which intends to give to the chief justice of the supreme judicial court the exclusive right to appoint an administrator of courts, violate part 1, article 29 of the Constitution by vesting in the chief justice those powers which part 1, article 29, vests in the supreme judicial court as a whole?

"5. Do the provisions of the first paragraph of section 1369 of said bill, which provides that the judge of the land court, the chief judge of probate and the judges of the housing courts shall be transferred to the superior court into which said courts are merged pursuant to said paragraph and become associate justices of the superior court, constitute demotions as to each of said judges in violation of part 2, chapter 3, article 1 of the Constitution?

"6. Does the fifth paragraph of section 1368 of said bill which provides that all justices and special justices of the municipal courts, including the municipal court of the city of Boston, existing district courts and juvenile courts shall become justices and special justices of the district court created by section 892 of said bill, and the first paragraph of section 1369 of said bill which provides that the judge and the associate judges of the land court, the chief judge, judges and special judges of probate and insolvency and judges of the housing court shall become associate judges of the superior court violate the constitutional powers of the executive department to appoint and commission judges and violate the

tenure of their commissions guaranteed by part 2, chapter 3, article 1 of the Constitution?

"7. Does the power and authority of the General Court to modify, enlarge, diminish, transfer and abolish the jurisdiction of all courts subordinate to the supreme judicial court extend to the merger of the probate court that is intended by the provisions of the first paragraph of section 1369 of said bill, whereby the said probate court, the housing courts, land court and courts of insolvency are to be merged with and into the superior court, despite the specific references to the probate court and probate judges contained in the Constitution, and more specifically in part 2, chapter 3, article 4 thereof?"

The bill, consisting of 312 pages and 1378 sections, was drafted to implement the recommendations for reorganization of the judicial branch submitted by the Governor's Select Committee on Judicial Needs.[1] While enactment of

---

[1] The Committee was appointed by the Governor in January, 1976, and charged "with the task of making legislative and administrative recommendations to reduce backlog and delay in our courts." Report on the State of the Massachusetts Courts 73 (1976). The Committee included Mr. Archibald Cox, professor of law at the Harvard Law School, and former Solicitor General of the United States, as chairman, judges, a retired Chief Justice of the Supreme Judicial Court, the Attorney General, district attorneys, legislative leaders, and attorneys and representatives of bar associations and other organizations interested in the judicial system. In December, 1976, the Committee submitted its report to the Governor. The Committee summarized its detailed recommendations as follows:

"1. The Judicial Branch should be reorganized in such a way as to encourage overall planning and flexible use of the total resources available for the administration of justice in meeting changing needs. The fragmentation of power and responsibility which is a major cause of both waste and delay should be eliminated by —

" — Focusing ultimate responsibility for the over-all business management of the entire judicial system in a single judicial head, subject to the power of 'general superintendence' belonging to the Supreme Judicial Court.

" — Establishing an adequately staffed administrative office to assist the Chief Justice and other officers in planning and coordinating administration.

" — Modifying the existing structure of the Commonwealth's courts

this bill would effect major changes in the structure and
organization of the judicial system, we limit our opinions,
as we must, to the specific constitutional questions pre-
sented. See Part II, c. 3, art. 2, of the Massachusetts Con-
stitution, as amended by art. 85 of the Amendments. *An-
swer of the Justices*, 299 Mass. 617, 619-620 (1938).[2]

1. The first question inquires whether various provi-
sions of § 781 of the bill "violate part 1, article 29 of the
Constitution by vesting in the chief justice of the supreme
judicial court those powers which part 1, article 29, vests
in the supreme judicial court as a whole." Section 781
would insert § 2A in G. L. c. 211. Under the new statute,
"[t]he chief justice of the supreme judicial court shall be
the executive head of the judicial system of the common-
wealth." He would be required to prepare and submit to
the budget director a budget for the entire judicial branch
and, except where otherwise provided by law, to appoint
and to prescribe the duties of all officers and employees of
the judicial system. In addition he would have the author-
ity to transfer or remove any such officer or employee. He
would be empowered also to establish, revise, or abolish di-
visions of the Superior and District Courts; to assign, tem-
porarily, District Court judges to the Superior Court and
Superior Court judges to the District Court; to transfer
and to authorize the chief justice of the Superior Court to
transfer cases from one county or division to an adjoining
county; to transfer and to authorize the chief justice of the
District Court to transfer cases from one division to an-

---

to the extent necessary to eliminate or reduce obstacles to over-
all planning and flexible allocation of resources.
" — State assumption of financial responsibility for all costs of the
judicial system, including the construction of new facilities." *Id.*
at 83.

[2] On March 16, 1977, we issued a notice inviting interested persons
to file briefs. Joint briefs were filed by the Governor and the Boston
Bar Association, and by the Attorney General and the chairman of the
Governor's Select Committee on Judicial Needs. Briefs were also filed
by the National Center for State Courts, the Massachusetts Law Re-
form Institute, the Massachusetts Bar Association, and the Chief Judge
and Administrative Committee of the Probate Courts.

other division; and to establish judicial regions and to appoint administrative justices for each region, one from the Superior Court and one from the District Court.[3]

---

[3] The proposed § 2A reads in its entirety as follows:

"*Section 2A.* The chief justice of the supreme judicial court shall be the executive head of the judicial system of the commonwealth. He shall prepare and submit to the budget director the statement required by section three of chapter twenty-nine which shall show, in detail, an estimate for the ordinary maintenance of the entire judicial system of the commonwealth, and the revenue therefrom, as provided in clause (5) of the first paragraph of said section three. Said estimate shall include judicial salaries and the salaries of all officers and employees within the judicial branch of the government of the commonwealth and shall include estimates of all sums which the commonwealth is obligated to pay under the provisions of chapter twenty-nine A.

"Said chief justice shall appoint and may remove all officers or employees necessary for the efficient administration of the judicial system of the commonwealth and shall prescribe the duties of such officers or employees; provided, however, that the register of probate in each county, a clerk of the courts in each county other than Suffolk, and, in Suffolk county, the clerk of the supreme judicial court for that county and the clerks of the superior court for civil and for criminal business therein shall be elected as provided in chapter fifty-four. Said chief justice may establish and may revise or abolish such divisions of the superior or district court as he deems the sound administration of justice requires.

"He may assign any justice of the district court to sit temporarily in the superior court, and any justice of the superior court to sit temporarily in the district court, whenever the prompt administration of justice requires.

"He may transfer, and may authorize the chief justice of the superior court to transfer, any case or matter entered in the superior court for any county or division to a session of the superior court in an adjoining county and may promulgate rules for the conduct of such a session.

"He may likewise transfer, and authorize the chief justice of the district court to transfer, any case or matter entered in a division of the district court for trial in another division.

"He may transfer appointive personnel employed in any branch of the judicial system of the commonwealth to a location other than that wherein they were assigned or employed, provided that no such transfer shall be made to a location more than a reasonable distance from the place where the officer or employee was employed or assigned.

"He may establish one or more judicial regions and appoint administrative justices for each region, one from the superior court and one from the district court, upon the recommendation of their respective chief justices. The administrative justices so appointed shall be responsible for planning and coordinating the management of such parts of the judicial business and assignment of court personnel within the region as affect both the superior and district courts."

Article 29 of our Declaration of Rights provides: "It is essential to the preservation of the rights of every individual, his life, liberty, property and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit. It is, therefore, not only the best policy, but for the security of the rights of the people, and of every citizen, that the judges of the supreme judicial court should hold their offices as long as they behave themselves well; and that they should have honorable salaries ascertained and established by standing laws." The language of the article sheds little light on the question what powers are vested in the full court of the Supreme Judicial Court. General Laws c. 211, § 3, as amended by St. 1973, c. 1114, § 44, provides that "the justices of the supreme judicial court shall . . . have general superintendence of the administration of all courts of inferior jurisdiction . . . and it may issue . . . such orders, directions and rules as may be necessary or desirable for the furtherance of justice, the regular execution of the laws, the improvement of the administration of such courts, and the securing of their proper and efficient administration." This statement confirmed to the Supreme Judicial Court the powers of judicial administration inherent in that court. *Matter of DeSaulnier (No. 1)*, 360 Mass. 757, 758-759 (1971). The repository of the inherent powers of judicial administration is the full court. Legislation which purports to divest the full court of these powers would be ineffective as beyond the power of the General Court. We do not mean to suggest that all the matters over which the Chief Justice would be given authority by the proposed statute would be subject to the inherent power of the full court. Indeed, most would not. The powers and duties that would be conferred on the Chief Justice with regard to administration of the Superior Court and the District Courts are powers the Legislature could confer on any appropriate State officer under its constitutional authority "to erect and constitute judicatories and courts of record, or other courts."

Part II, c. 1, § 1, art. 3, of the Massachusetts Constitution. However, any delegation of the inherent powers of the court is a matter on which only the full court, and not the Legislature, may act.

The purpose of the provisions in § 2A, designating the Chief Justice "executive head of the judicial system of the commonwealth" and conferring on him certain administrative duties and responsibilities, is clear and compelling. The courts of the Commonwealth are burdened with intolerable caseloads. *Opinion of the Justices,* 362 Mass. 895, 905 (1972). The resultant delay in the adjudication of cases is exacerbated by what the Governor's Select Committee on Judicial Needs described as "the extraordinary fragmentation of jurisdiction and responsibility." Report on the State of the Massachusetts Courts 3 (1976).[4] The obvious intent of the drafters of § 781 of the bill was to centralize administrative control in the Chief Justice in order to make the most effective and efficient use of judicial facilities and personnel.

---

[4] More specifically the Committee reported to the Governor as follows:

"Financing of the court system as a whole is widely dispersed and uncoordinated. Over 400 separate annual budgets as submitted by the courts to various local, county and Commonwealth authorities. Approximately 20 percent of the total cost of operating the court[s] is paid by the Commonwealth. Thirteen counties and the City of Boston pay the remaining 80 percent. Most courthouse facilities are county financed. Some judges' salaries are paid by the Commonwealth, others by the various counties. Some support personnel are paid by the Commonwealth, others by the counties. Some costs are paid jointly by a county and by the Commonwealth. No court personnel or facilities financed by one county can be used for the benefit of a part of the system financed by another county or by the Commonwealth without elaborate legislative provision for reimbursement from the using authority to the financing authority" (footnote omitted). Report on the State of the Massachusetts Courts 9 (1976).

"Fragmentation diffuses responsibility. Today, no one is charged with the executive management of the flow of judicial business, with marshalling the available resources of the entire Judicial Branch so as efficiently to meet the demands upon it. No one is charged with planning the resources for future needs. For example, a new courthouse was built for one district court with two fully equipped courtrooms for jury sessions even though the court has no jurisdiction to compel disposition of any case by jury trial. Four years after construction no jury trial had ever been held in either courtroom." *Id.* at 3.

In so far as the statute purports to authorize the Chief Justice to exercise powers inherent in the full court, it would be ineffective. We have no reason to assume, however, that a Chief Justice of the Supreme Judicial Court, exercising the powers described in § 781 of the bill, would not perform his duties and exercise his authority within constitutional limits or that he would improperly attempt to exercise powers reserved to the full court. See *Opinion of the Justices,* 354 Mass. 804, 808 (1968).[5]

We answer the first question in the negative.

2. The second question asks whether the second paragraph of proposed G. L. c. 211, § 2A, as appearing in House No. 4400, § 781, authorizing the Chief Justice of the Supreme Judicial Court "to revise or abolish such divisions of the superior or district court as he deems the sound administration of justice requires" would violate the constitutional command that "the judicial [department] shall never exercise the legislative and executive powers, or either of them." Declaration of Rights art. 30. As we have already noted, the Legislature has been given full power to constitute courts. Part II, c. 1, § 1, art. 3. The underly-

---

[5] We note that most States which have expressly addressed questions of judicial supervision have vested administrative powers in the Chief Justice, rather than in an administrative board or in the Supreme Court as a whole. However, it appears that ultimate superintendence power generally continues to reside in the entire court. See, e.g., Alaska Const. art. 4, §§ 15-16 (Chief Justice is administrative head of all State courts and may appoint an administrative director, but the Supreme Court is empowered to enact rules for administration of the courts); Arizona Const. art. 6, § 3 (Supreme Court has administrative supervision over all courts of the State; Chief Justice, elected for five-year terms by Justices of the Supreme Court, is charged with exercising this supervisory power); Colorado Const. art. 6, §§ 2, 5 (2) (Chief Justice elected by Supreme Court Justices is exclusive head of the judicial system, but the Supreme Court has general superintending control over all inferior courts); Florida Const. art. 5, §§ 2, 4 (3) (administrator of the judicial system is the person elected by the Supreme Court to be Chief Justice of that court for a two-year term); Illinois Const. art. 6, § 16 ("General administrative and supervisory authority over all courts is vested in the Supreme Court and shall be exercised by the Chief Justice in accordance with its rules."); Missouri Const. art. 5, §§ 6, 8 (Supreme Court elects a Chief Justice to preside over court sessions for a four-year term; power to make temporary transfers of judges among the courts is granted to the Supreme Court as a body).

ing issue is whether the provision involved would, if enacted, result in an impermissible delegation of legislative power. We think that it would not.

We have heretofore recognized that separation of powers does not require three "watertight compartments" within the government (*Opinion of the Justices*, 365 Mass. 639, 641 [1974], quoting Holmes, J., dissenting in *Springer* v. *Government of the Phil. Islands*, 277 U.S. 189, 211 [1928]), for many "legislative" powers sufficiently implicate judicial functions to permit their exercise by the judiciary. See, e.g., *Opinion of the Justices*, 336 Mass. 765, 770-771 (1957) (Superior Court may supervise wiretapping); *Collins* v. *Godfrey*, 324 Mass. 574, 576-579 (1949) ("[T]he judicial department in the performance of its constitutional duties ... [has] control over the bar" [at 578], and may adopt rules governing conduct of attorneys); *LaChapelle* v. *United Shoe Mach. Corp.*, 318 Mass. 166, 170 (1945) (upholding statute allowing Supreme Judicial Court to appoint a master to report to the Attorney General in cases of alleged monopoly); *Keenan, petitioner*, 310 Mass. 166, 171 (1941) (admission to bar is a function of the "judicial department"); *Catheron* v. *County of Suffolk*, 227 Mass. 598, 602 (1917) (judges may appoint probation officers); *Boston* v. *Chelsea*, 212 Mass. 127, 130-131 (1912) (upholding statute which required the Supreme Judicial Court to appoint commissioners to determine the apportionment of the expenses of Suffolk County among various cities within the county); *Dow* v. *Wakefield*, 103 Mass. 267, 273 (1869) (allowing Supreme Judicial Court to appoint commissioners to apportion the expenses of operating a bridge between Boston and Charlestown).

While there can be no doubt that art. 30 demands a separation of the governmental powers entrusted to the three branches of government in this Commonwealth (*Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 116 [1922]), it does not prevent one branch from assuming those functions which would aid its internal operations without unduly restricting the endeavors of another coordinate branch. The inherent authority of the judiciary "is not

limited to adjudication, but includes certain ancillary functions, such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate." *O'Coin's, Inc.* v. *Treasurer of the County of Worcester*, 362 Mass. 507, 510 (1972). In the *O'Coin's* case, this court held that a judge could bind a county contractually for the cost of a tape recorder purchased to permit the operation of criminal sessions when no stenographer was available. Although the judge's purchase in that case involved a definite interference with and assumption of powers customarily exercised by the legislative branch, the court held that the availability of certain fundamental resources was necessary to guarantee the fair and efficient functioning of the courts. The authority to procure such essentials "must be vested in the judiciary if the courts are to provide justice, and the people are to be secure in their rights, under the Constitution." *Id.*

· In evaluating the constitutionality of the proposed act, "[t]he test is whether the statute 'authorizes the courts to perform a function so closely connected with and so far incidental to strictly judicial proceedings that the courts in obeying the statute would not be exercising executive or nonjudicial powers.'" *Opinion of the Justices*, 336 Mass. 765, 770 (1957), quoting from *LaChapelle* v. *United Shoe Mach. Corp.*, 318 Mass. 166, 168 (1945). The court has not hesitated to strike down attempted delegations of legislative or executive power to the judiciary, where the power sought to be delegated was not closely related to customary judicial activities or to the operation of the courts. See, e.g., *Collins* v. *Selectmen of Brookline*, 325 Mass. 562, 565 (1950); *Opinion of the Justices*, 300 Mass. 596, 599 (1938) (both holding that the removal of elected or appointed officials is an executive function in no way incidental to any judicial function). But the court has been equally consistent in upholding the delegation of powers which, although partaking of some aspects of legislative functions, are so strongly implicated in judicial administration as to be properly exercised by the courts. In *Commonwealth* v. *Leach*, 246 Mass. 464 (1923), this court up-

held a statute (St. 1923, c. 469) providing that judges of the District Courts shall sit on criminal trials in the Superior Court when requested by the chief justice of that court. The court's observation on the function of that statute applies with equal force to the question at hand: "The statute here assailed establishes no new courts. It creates no new judges. It provides for no new officers. Its utmost sweep is to utilize existing courts and to employ judges already appointed and commissioned for different service from that hitherto required. It is an adaptation of the present judicial organization to changed conditions." *Id.* at 474.

Similarly, in *Ashley v. Three Justices of the Superior Court,* 228 Mass. 63 (1917), the court upheld against constitutional challenge a statute (St. 1914, c. 783, § 10 [c]) which provided for the hearing of election petitions by three Superior Court judges appointed by the chief justice of that court. The court noted that Justices of the Supreme Judicial Court itself are periodically shifted from the full court sittings to the single justice sessions, and observed that "[i]t requires no argument to demonstrate that the designation of the justices to sit as the full court is a judicial duty." *Id.* at 72. As in the *Leach* case, *supra,* the statute involved in the *Ashley* case created no new court and required no additional judges. It merely directed the chief justice to ensure that the necessary judges were designated to hear alleged violations of the corrupt practices act. A comment in the *Ashley* case is likewise applicable to the question now before us: "It is an appropriate function of the office of Chief Justice to make such assignments as are required by this statute. It is a detail in the efficient administration of justice by courts composed of several judges that the Chief Justice should arrange a division of work among the different judges in such a way as to promote the transaction of the business of the court in the most satisfactory manner. It is the performance of a strictly judicial duty." *Id.* See *Opinion of the Justices,* 339 Mass. 781 (1959) (upholding the constitutionality of a proposed statute [G. L. c. 212, § 30] that

would require the chief justice of the Superior Court to appoint three associate justices of that court to hear and determine certain proceedings involving labor disputes).

A similar conclusion was reached in *Buchannan* v. *Meisner*, 279 Mass. 457 (1932), which upheld (although not expressly mentioning art. 30) the authority of the Appellate Division to resolve questions of law arising in civil proceedings in the District Courts. The Appellate Division was not a new, separate court, but rather consisted of judges of the District Courts sitting in appellate review by special designation of the Chief Justice of the Supreme Judicial Court. The establishment of an Appellate Division "made use of judges already appointed and provided for their designation to new duties to the end that the administration of justice might be simplified, might not be delayed, and might be more efficient." *Id.* at 460.

We find much the same function in that part of the proposed statute which would authorize the Chief Justice of the Supreme Judicial Court to establish, revise or abolish divisions of the Superior or District Courts. In its Report on the State of the Massachusetts Courts at 16, the Governor's Select Committee on Judicial Needs suggested an important rationale for authorizing divisions within a unified Superior Court: the use of specialized divisions could preserve the expertise which certain judges and support staffs have developed in the Housing, Land, and Probate Courts of this Commonwealth. "The divisions, if established, should be based upon function and need; they should not automatically follow the existing pattern or jurisdiction lines of the now separate courts." We think that the Legislature might justifiably conclude that the establishment, revision or abolition of functional divisions, or the decision to operate without divisions, might best be made by those who are closest to the judicial processes and who would be in the most knowledgeable position to alter the structure as experience might prove desirable. We conclude, moreover, that the decisions involved are so fundamentally related to the ongoing operation of existing statutory courts as to be appropriately within the realm of

judicial authority and thus properly subject to a legislative decision to repose the power therefor in a judicial officer. Cf. *O'Coin's, Inc.* v. *Treasurer of the County of Worcester,* 362 Mass. 507 (1972).[6]

Accordingly, we answer the second question in the negative.

3. The third question asks whether certain provisions in § 781 of the bill empowering the Chief Justice of the Supreme Judicial Court to transfer or authorize the transfer of criminal cases from one county to an adjoining county would contravene art. 13 of the Declaration of Rights. The provisions, which would appear in G. L. c. 211, § 2A, are as follows:

"He may transfer, and may authorize the chief justice of the superior court to transfer, any case or matter entered in the superior court for any county or division to a session of the superior court in an adjoining county and may promulgate rules for the conduct of such a session.

"He may likewise transfer, and authorize the chief justice of the district court to transfer, any case or matter entered in a division of the district court for trial in another division." Article 13 provides: "In criminal prosecutions, the verification of facts in the vicinity where they happen, is one of the greatest securities of the life, liberty, and property of the citizen."

In 1824, this court declared that article 13 "is not prohibitory of a trial of an offence, in any other county than that in which it happened; nor is it affirmative of a right in the citizen to be tried in any particular county. It is

---

[6] Other jurisdictions have recognized that the establishment of divisions within a court is "solely for the purpose of facilitating the work of the court" (*Proceedings on Behalf of Judge for Parish of Orleans* v. *Grosch,* 221 La. 1082, 1087 [1952]) and is "simply for the convenience and expedition of business" (*People* v. *Connolly,* 103 Cal. App. 2d 245, 248 [1951]). Chief Justice Vanderbilt observed that the division of the New Jersey Superior Court into Courts of Chancery and of Law was intended "to effectuate the constitutional mandate that we have a unified court system without sacrificing the obvious advantages to be gained by having cases normally tried before judges who are specialized in law or equity." *O'Neill* v. *Vreeland,* 6 N.J. 158, 166 (1951).

merely declaratory of the sense of the people, that the proof of facts in criminal prosecutions should be in the vicinity or neighbourhood where they happen." [7] *Commonwealth* v. *Parker,* 2 Pick. 550, 553 (1824). Selection of the general term "vicinity" rather than the more precise, technical term "county" by the drafters of art. 13, men learned in the law, manifests an intention that a narrow, technical interpretation of the word is to be avoided.[8] *Id.* Although art. 13 imposes some limitation on the places where a criminal defendant may be tried, it allows the Legislature discretion, consistent with the public interest and the interests of justice, to establish venue requirements for criminal trials. This flexibility was recognized and utilized prior to the adoption of art. 13, both in England and in Massachusetts and is a part of our common law. *Crocker* v. *Superior Court,* 208 Mass. 162, 165-174 (1911). *Commonwealth* v. *Parker, supra* at 554-555. It is also reflected in the special venue and transfer statutes currently in force in the Commonwealth. G. L. c. 277, § 51 (change of venue allowed for impartial trial at request of defendant in capital case); § 57 (prosecution allowed in either county or judicial district when crime committed close to boundary line); § 60 (homicide prosecution permitted in either

---

[7] Changes in the composition and institutional role of the petit jury have rendered less important the former claim that "it is important that [the defendant] should have a jury . . . of his neighbours, who know him and who know the witnesses, and whose means of information and habits of thinking qualify them for deciding his case correctly." *Commonwealth* v. *Parker,* 2 Pick. 550, 552 (1824) (Reporter's summary of argument by the defense attorney). In *State* v. *Brown,* 103 Vt. 312, 316-317 (1931), the court noted the changing role of the petit jury and concluded that there was little merit to the reasons for the common law rule that criminal offenses be prosecuted only in the county where committed. By pointing to the removal of an important reason for the adoption of art. 13 we do not wish to suggest that this constitutional provision now lacks meaning.

[8] Undoubtedly, the increased mobility of people and ideas, caused by the advent of modern forms of transportation and communications, has resulted in an expanded concept of the territorial limits implied in the word "vicinity." Cf. *Commonwealth* v. *Petralia, ante,* 452, 457 (1977). Although we make this observation, we find it unnecessary to rely on it in answering the question posed.

county if criminal act transpires in one county and death occurs in another).

The reason for the proposed provisions giving the Chief Justice transfer powers is to enable him to make full use of judicial manpower and facilities to the end that the staggering caseloads of the Massachusetts courts will be reduced and parties will receive prompt disposition of their cases. The purpose of the provisions, then, relates to matters of great public concern and to the interests of justice. It is wholly consistent with the intent of art. 13, which is "to hold out a caution to all future legislatures ... but not to prohibit them from causing trials to be had in adjoining counties when the public interest should demand it." *Commonwealth* v. *Parker, supra* at 555.

We conclude that the provision in § 781 of the bill that would empower the Chief Justice of this court to transfer or authorize the transfer of cases from one county to an adjoining county would not contravene art. 13.[9]

Accordingly, we answer question 3 in the negative.

4. We are asked in question 4 whether § 783, which would authorize and require the Chief Justice of the Supreme Judicial Court to appoint a court administrator, would violate art. 29 of the Declaration of Rights "by vesting in the chief justice those powers which part 1, article 29, vests in the supreme judicial court as a whole." Section 783 would insert in G. L. c. 211 a new § 3A, which would provide:

"*Section 3A.*   The chief justice of the supreme judicial court shall appoint an administrator of courts who shall have such powers and perform such duties as the chief

---

[9] Our conclusion is supported by the case law of other jurisdictions. See *State* v. *Baldwin,* 305 A.2d 555 (Me. 1973) (constitutional requirement that criminal defendant be tried by jury of the "vicinity" is not violated by trial in a county different from that where offense committed so long as conducted in the general neighborhood of the crime); *State* v. *Murphy,* 134 Vt. 106 (1976) (constitutional requirement of trial in the same "country" as the offense does not bar transfer to another county). Cf. *People* v. *Taylor,* 39 N.Y.2d 649 (1976) ("State and district" provision of the Sixth Amendment does not require trial in the county where the offense occurred).

justice shall determine. Said administrator shall, subject to appropriation and with the approval of the chief justice, appoint such legal, expert, clerical and other assistants as the duties of his office shall require.

"Said administrator shall receive from the commonwealth such salary as the chief justice shall fix, not exceeding seventy-five percent of the salary of an associate justice of the supreme judicial court. He shall be provided with suitable quarters in the Suffolk county courthouse in the city of Boston."

What we said in response to the first question applies with equal force here. Since the Legislature has the constitutional power to create courts and civil offices (Massachusetts Constitution, Part II, c. 1, § 1, arts. 3, 4) it has authority to create an office which would be responsible for the administration of all statutory courts and to give the power of appointment to the Chief Justice of this court. However, any legislative attempt to give to the Chief Justice the power to appoint a court administrator who would exercise powers inherent in the full court would be of no effect with regard to those powers. We emphasize that we have no reason to assume that the Chief Justice would attempt to confer upon the court administrator any of the inherent powers of the full court without appropriate authorization from the Justices of that court.

Accordingly, we answer the fourth question in the negative, with the same reservation as to the inherent powers of the full court that we stated in our answer to the first question.

5. In response to question 5, we must ascertain whether enactment of § 1369 of House No. 4400, which directs that the judge of the Land Court, the chief judge of the Probate Courts, and the judges of the Housing Courts shall become associate justices of the Superior Court consequent to the merger of the Land, Probate and Housing Courts with the Superior Court, would result in a demotion of any of these judges in violation of Part II, c. 3, art. 1, as amended by art. 98 of the Amendments to the Constitution. This constitutional provision is addressed to the ten-

ure of judicial officers and provides in relevant part: "All judicial officers, duly appointed, commissioned and sworn, shall hold their offices during good behavior, excepting such concerning whom there is different provision made in this Constitution." Tenure, under this provision, entitles an individual who has been commissioned as a judicial officer to hold his office "during good behavior" unless removed in a manner otherwise permitted by the Constitution. The duration of his commission as a judicial officer is settled by the Constitution and may not be "enlarged, limited, modified [or] altered" by the Legislature. *Opinion of the Justices*, 271 Mass. 575, 580 (1930). It is therefore beyond the prerogative of the Legislature to enact a measure which would limit the length of service of a judicial officer to a term of years or force judges to retire at an age different from that set by the Constitution. *Id.* at 580-581. *Commonwealth* v. *Leach*, 246 Mass. 464, 471 (1923). The important issue raised by question 5 is whether the judge of the Land Court, the chief judge of the Probate Courts and the judges of the Housing Courts have, by virtue of their designations or appointments, a right secured by the tenure provision of the Constitution not to be transferred to the Superior Court in the capacity of associate justices of that court.

We have previously had occasion in this opinion to refer to the "full power and authority to erect and constitute judicatories and courts of record" vested in the Legislature by Part II, c. 1, § 1, art. 3. In addition to establishing courts of general jurisdiction, the Legislature has in past years created courts of special jurisdiction such as the Land, Probate and Housing Courts to meet the particular requirements of citizens who must turn to the judicial system to administer estates, determine rights or status, or resolve conflicts arising in these areas of the law. At various junctures in the development of the Land, Probate and Housing Courts the Legislature made provisions for the designation of one of their members as "judge" or "chief judge." St. 1898, c. 562, § 3 (Land Court). St. 1963, c. 819, § 2 (Probate Courts). St. 1974, c. 700, § 3 (Housing Court

of the City of Boston). Attendant to their designations, the "chief judges" were assigned various administrative responsibilities which were designed by the Legislature to facilitate the efficient management of judicial business.[10] These administrative tasks were directed by the Legislature to be performed in addition to the regular judicial functions of the judges.

In its report to the Governor, the Governor's Select Committee on Judicial Needs recommended that the executive management of judicial business be restructured and centralized along with the merger of the Land, Probate and Housing Courts with the Superior Court.[11] If enacted in its present form, § 1369 of the bill would divert the responsibility for the performance of administrative tasks currently assigned to the "chief judges" of the Land, Probate, and Housing Courts to the chief justice of the Superior Court.

Neither the courts nor the judicial posts referred to in question 5 were established by the Constitution. *Commonwealth* v. *Leach, supra* at 470. Without exception, they are the products of legislative action. G. L. c. 185 (Land Court). G. L. c. 215 (Probate Courts). G. L. c. 185A, G. L. c. 185B (Housing Courts). In addition to creating courts, the Legislature has frequently utilized its broad constitutional authority to reorganize those courts which are subordinate to the Supreme Judicial Court.[12] When the Legis-

---

[10] Judge of the Land Court: G. L. c. 185, §§ 4, 11, 12. Chief judge of the Probate Courts: G. L. c. 217, §§ 8, 8A. Chief judge of the Housing Court of the City of Boston: G. L. c. 185A, §§ 10, 11, 12, 15, 16, 18.

[11] Report on the State of the Massachusetts Courts 19-26 (1976).

[12] "In 1782, . . . the Legislature established a Court of Common Pleas, endowing it solely with civil jurisdiction. St. 1782, c. 11. In 1804, it added to that court's jurisdiction all criminal jurisdiction of the Court of Sessions. St. 1803, c. 154. In 1811, it reorganized the Court of Common Pleas, which had consisted of four judges per county, by establishing six judicial circuits of the court, each circuit consisting of several counties, and allowing retention of only three judges per circuit. St. 1811, c. 33. In 1814, the Legislature established the Boston Court of Common Pleas, vesting in it all jurisdiction of the former Courts of Common Pleas. St. 1813, c. 173. In 1821, it repealed all former acts concerning the Courts of Common Pleas, and established one

lature creates a judicial office and reposes in its incumbent specific powers and duties, it may reorder or abolish the office and expand, diminish or transfer the powers and duties it has assigned to the incumbent. *Commonwealth* v. *Leach, supra* at 470-471. *Russell* v. *Howe,* 12 Gray 147, 153 (1858). *Dearborn* v. *Ames,* 8 Gray 1, 14-15, 19-20 (1857). *Brien* v. *Commonwealth,* 5 Met. 508, 516 (1843). *Wales* v. *Belcher,* 3 Pick. 508, 509-510 (1826).

"[W]e think it has been the frequent practice under the Constitution, to alter, change and transfer the duties and powers of tribunals and officers, judicial and others, although their appointment was provided for in terms by the Constitution, and, although at the time of their appointment, and by force of such appointment, they were vested with powers and jurisdiction well defined, known and understood; and we believe that such jurisdiction has been altered, modified and transferred from time to time as the exigencies of the times and the public interests have seemed to the legislature to require, without being supposed to be in violation of the Constitution." *Dearborn* v. *Ames, supra* at 19-20.

The question is not entirely free of doubt. See *Opinion of the Justices,* 271 Mass. 575, 581 (1930). Cf. *Opinion of Justices,* 8 Gray 20, 21 (1857) (separate opinion of Thomas, J.). Were a bill pending which appeared designed to oust a particular "chief judge," or a number of them,

---

court of Common Pleas for the Commonwealth, consisting of four judges. St. 1820, c. 79. Eventually it abolished altogether the Court of Common Pleas, transferring its jurisdiction to a Superior Court established in its stead. St. 1859, c. 196.

"Similarly, the Legislature had provided for a Court of Sessions in 1807 and 1808. St. 1807, cc. 11, 57. In 1809, it transferred all powers and duties of that court to the Court of Common Pleas. St. 1809, c. 18. It revived the Court of Sessions in 1811, St. 1811, c. 81, but in 1814 abolished the court in all counties except Suffolk, Dukes and Nantucket. St. 1813, c. 197. In 1819, it reestablished the court, St. 1818, c. 120, but in 1821 abolished the court in Suffolk County. St. 1821, c. 109. In 1826, it transferred some of the court's jurisdiction to Commissioners of Highways, St. 1825, c. 171, and in 1827 abolished both the Court of Sessions and the Commissioners of Highways, transferring duties of both to County Commissioners. St. 1827, c. 77." Brief Amicus Curiae of the Governor 17-18.

we might well express the opinion that it would be uncon-
stitutional. We note that House No. 4400 contemplates
that the possibility that an enlarged Superior Court might
well be structured to incorporate specialized divisions
within it. § 781. If such divisions were to be created as part
of the plan of reorganization so as to carry into the Su-
perior Court structure divisions similar in their function
and responsibility to the present Land, Housing, and Pro-
bate Courts, and if each such division were to have a "chief
judge" or presiding judge designated therefor, the present
"chief judges" might well claim such position to be consti-
tutionally mandated to the present incumbents. This is not
to say, however, that the Constitution mandates the pres-
ervation of such positions.

In the context of a comprehensive reorganization of the
court system, where the current judge of the Land Court,
the chief judge of the Probate Courts, and the judges of
the Housing Courts are to become associate justices of the
Superior Court without loss of vacation, sick leave, sen-
iority or retirement benefits, a reassignment of their indi-
vidual administrative responsibilities and the loss of what-
ever status adheres to the authority to perform those tasks
and the loss of the designation of "chief judge" does not
constitute a demotion prohibited by the judicial tenure
provision of the Constitution.[13] If the Legislature deter-
mines to restructure the Massachusetts courts, it may, in
conjunction with merging courts of limited jurisdiction
into an expanded court with a broadened jurisdiction,

---

[13] We note that the salary presently received by an associate justice
of the Superior Court is $36,203. G. L. c. 212, § 27. The judge and asso-
ciate judges of the Land Court also receive a· salary of $36,203. G. L.
c. 185, § 14. Full time probate judges receive a salary of $31,738, and
the chief judge of the Probate Courts receives a salary of $32,944. G. L.
c. 217, § 34. The chief judge of the Housing Court of the City of Boston
and the judge of the Housing Court of the County of Hampden receive
the same salary as that received by an associate justice of the Superior
Court. The associate judge of the Housing Court of the City of Boston
receives ninety per cent of the salary received by associate justices of
the Superior Court. G. L. c. 185A, § 8; c. 185B, § 8. In each case, the
salaries of the judges who would be transferred by § 1369 to the Su-
perior Court would remain at the same level or be increased.

transfer the "chief judges" of the merged courts to the reconstituted court as long as it does not disturb the right of the transferred "chief judges" to retain their judicial offices of associate judges of the Superior Court during good behavior. What the Legislature seeks to alter as a consequence of implementing a comprehensive court reorganization plan is a system of multiple specialized courts with limited subject matter jurisdiction whose administrative requirements are the responsibility of the "chief judges" of those courts. Section 1369 does not reassign the "chief judges" to positions as associate justices of their respective existing courts (compare *Opinion of the Justices*, 271 Mass. at 581) ; rather it would augment their authority to hear and decide cases by including them in a court of expanded subject matter jurisdiction. Transfer of judges to positions of expanded jurisdiction and reduced administrative responsibility, coupled with an increase in compensation for most of them, cannot be viewed as a demotion in violation of the judicial tenure provision of the Constitution. The fact that the Legislature originally entrusted these administrative responsibilities to the "chief judges" and provided for their designation as "judge of the Land Court," "chief judge" of the Probate Courts, or "chief judge of the Housing Court of the City of Boston" does not deprive the Legislature of the power to reallocate the administrative responsibilities without in any way altering the tenure of those judicial officers. Where the clear object of the bill is to reorganize the judiciary to promote a more efficient administration of justice, the measure is not rendered unconstitutional because as a necessary incident of merging courts of limited jurisdiction into a court of broad general jurisdiction the "chief judges" of the courts of lesser jurisdiction are relieved of their administrative responsibilities and their special designations.

Accordingly, we answer question 5 in the negative.

6. Section 1368 of House No. 4400 provides that all justices and special justices of the Municipal Courts, Juvenile Courts, and existing District Courts shall become justices and special justices of the reconstituted District Court,

and § 1369 directs that the judge and associate judges of
the Land Court, the chief judge, judges, and special judges
of the Probate Courts, and the judges of the Housing
Courts shall become associate justices of the Superior
Court. Question 6 asks whether the transfer of judges
which would be accomplished under §§ 1368 and 1369 of
the bill would violate the constitutional authority of the
executive department to appoint and commission judges
or abridge the constitutionally protected tenure rights of
the transferred judges.

In Part II, c. 2, § 1, art. 9, the Constitution empowers
the Governor, by and with the advice and consent of the
Council, to nominate and appoint all judicial officers. The
Legislature, as we have noted, has broad authority to cre-
ate and abolish courts subordinate to the Supreme Judi-
cial Court and to modify, enlarge, diminish or transfer the
powers of judges and the jurisdiction of courts. Massachu-
setts Constitution Part II, c. 1, § 1, art. 3. *Russell* v. *Howe*,
12 Gray 147, 153 (1858). *Dearborn* v. *Ames*, 8 Gray 1, 19-
20 (1857). However, it may not create courts the judges of
which are not to be appointed by the Governor with the
consent of Council. Massachusetts Constitution Part I,
art. 30. *Commonwealth* v. *Leach*, 246 Mass. 464, 471
(1923). House No. 4400 neither abolishes existing courts
nor establishes new ones.[14] Its purpose of reorganizing the
Massachusetts trial courts is to be accomplished by merg-
ing existing courts into a unified system composed of two
levels of trial courts, each with expanded jurisdictional au-
thority. We have recently stated that although the sepa-

---

[14] The distinction between merger and abolition of courts was well
stated in *Suermann* v. *Hadley,* 327 Pa. 190 (1937). "Reorganization of
an existing system or department of government does not necessarily
require abolition of prevailing offices; in fact, generally that is an un-
usual procedure, and the intent to wipe out the old structure must be
clearly apparent." *Id.* at 197. "Where in any such reorganization or
change any part of the old legislation is retained in the new, unless the
changes created by the new system are of such nature in substantive
parts as to uphold an intent to abolish existing offices, the old appoin-
tees continue in office in obedience to the constitutional mandate." *Id.*
at 200.

rate and distinct status of an entity terminates upon merger, its attributes continue to exist in a reconstituted form. *First Bank & Trust Co.* v. *Attorney Gen.,* 371 Mass. 796, 802-803 (1977). The merger of the various Municipal, Juvenile and District Courts into a consolidated District Court would not abolish the offices of the justices and special justices of those courts. It would merely transfer the justices and special justices along with their judicial offices to an expanded court which would become a confederation of their predecessor courts. Correspondingly, the merger of the Land, Probate and Housing Courts with the Superior Court would simply transfer the judges of those courts to an augmented Superior Court without abolishing or vacating the judicial offices which the judges of those courts presently hold.[15]

---

[15] There are many cases from other jurisdictions bearing on the reorganization of trial courts. See, e.g., *Lamar* v. *United States,* 241 U.S. 103, 118 (1916) ("We think merely to state [the claim that the assignment of judges to other circuits violates the appointment and confirmation power of the President and Senate] suffices to demonstrate its absolute unsoundness"); *McDowell* v. *United States,* 159 U.S. 596, 598-599 (1895) ("District Courts are solely the creation of statute, and the place in which a judge thereof may exercise jurisdiction is subject absolutely to the control of Congress"); *Bland* v. *Kennamer,* 6 F.2d 130 (8th Cir. 1925) (district judge may be designated to sit in a district other than the one to which he was originally appointed); *Cherokee County* v. *Savage,* 249 Ala. 688, 690 (1947) ("The legislative power to create a court carries with it the power to abolish it"); *Perkins* v. *Corbin,* 45 Ala. 103, 119 (1871) (Legislature may abolish courts to which constitutional protection does not extend); *Hart* v. *Wayne County,* 396 Mich. 259, 273 (1976) (courts which the Legislature can constitutionally establish may also be modified without constitutional amendment); *State ex rel. Davis* v. *Mann,* 41 Mo. 395, 397 (1867) (Legislature has power to reorganize inferior tribunals); *State* v. *Davis,* 119 Ohio St. 596, 602-603 (1929) ("[T]he power to create a court necessarily includ[es] the power to define its jurisdiction and to provide for its maintenance"; thus "it follows ... that the power to provide for the maintenance of courts inferior to Courts of Appeals ... is conferred upon the Legislature by the Constitution"); *Commonwealth* v. *Green,* 58 Pa. 226, 230 (1868) (although Legislature may not abolish constitutional courts, it may vest some of their jurisdiction in other tribunals); *Commonwealth* v. *Hopkins,* 53 Pa. Super. Ct. 16, 21, aff'd 241 Pa. 213 (1913) ("From the expressly recognized right to create new courts we naturally and necessarily deduce the further legislative right to define the jurisdiction of the courts created save in so far, and so far only, as such right may be denied or limited by the constitution itself").

On a less comprehensive scale, the Legislature has enacted provisions which have accomplished objectives similar to those of House No. 4400. *Ashley* v. *Three Justices of Superior Court,* 228 Mass. 63 (1917). *Commonwealth* v. *Leach,* 246 Mass. 464 (1923).[16]

In transferring all justices and special justices of the Municipal, Juvenile and District Courts to a unified District Court and all Land, Probate and Housing Court judges to a consolidated Superior Court to effectuate a comprehensive reorganization of the Massachusetts trial courts, the Legislature would not usurp the constitutional authority of the Governor and Council to appoint judicial officers. The provisions of §§ 1368 and 1369 of House No. 4400 for the unification of the present District and Municipal Courts into a single court, and for the merger of the Probate, Land and Housing Courts into the Superior Court would establish no new courts and would create no new judicial offices. Rather, they would utilize existing courts and employ judges already appointed and commissioned for staffing the two resulting trial courts. This would be an adaptation of the present judicial manpower to changed conditions in order to relieve congestion in the trial courts. *Commonwealth* v. *Leach,* 246 Mass. 464, 474 (1923). The Constitution presents no obstacle to the enactment of the proposed plan.

The second part of question six asks whether the transfer of all justices and special justices of the Municipal Courts, existing District Courts and Juvenile Courts to a unified District Court as well as the proposed transfer of the judge and associate judges of the Land Court, the chief

---

[16] We note that the Legislature has directed that special justices of the District Courts may, upon fulfilling certain requirements, become full-time special justices with the same judicial powers and responsibilities held by full-time justices of the District Courts. G. L. c. 218, § 6A. Moreover, the Legislature has empowered the Chief Justice of this court to authorize any justice or special justice of a District Court to serve in Superior Court and to "exercise all the powers and duties which a justice of the superior court has and may exercise in any matter, civil or criminal, over which the superior court has jurisdiction." St. 1976, c. 303, § 1.

judge, judges and special judges of the Probate Courts, and the judges of the Housing Courts to the Superior Court in the capacity of associate justices of that court would violate the judicial tenure provision of the Constitution. We are of opinion that it would not.

The constitutional guaranty of tenure insulates judges from arbitrary dismissal by either of the other two branches of government or by popular referendum. The salient purpose of the tenure provision is to encourage judicial officers to maintain the qualities of independence and impartiality which promote conscientious exercise of their judicial functions.

The demonstrated intention of House No. 4400 is to reorganize the Massachusetts trial courts without undermining the safeguards accorded judicial officers by the Constitution's judicial tenure provision.

We have not hesitated to affirm the Legislature's authority under Part II, c. 1, § 1, art. 3, of the Constitution to allocate jurisdiction among the courts it has established or to transfer jurisdiction from one class of judicial officers to another without adversely affecting the tenure rights of judges. *Commonwealth* v. *Leach, supra. Dearborn* v. *Ames, supra.* In *Wales* v. *Belcher,* 3 Pick. 508 (1827), we approved the legislative creation of a combined Police Court and Justices' Court for Suffolk County and the transfer to that court of exclusive jurisdiction to hear cases formerly cognizable by the justices of the peace. Additionally, in *Brien* v. *Commonwealth,* 5 Met. 508, 516 (1843), we found no constitutional impediment to legislative abolition of the office of Municipal Court judge and the reassignment of the jurisdiction of the Municipal Court to the Court of Common Pleas.

Many decisions and opinions of this court recognize the broad scope of the Legislature's power to restructure the judicial system to promote the more efficient administration of justice. We are of opinion that the transfer of judges pursuant to a merger of specialized courts into the Superior Court and the unification of the District Courts is within the authority of the Legislature, and that the

enactment of §§ 1368 and 1369 of House No. 4400 would not affect the constitutional tenure rights of the judicial officers involved.

We answer question six in the negative.

7. The seventh question asks whether the Legislature may merge the Probate Courts into the Superior Court despite a reference to Probate Courts in Part II, c. 3, art. 4, of the Constitution.[17] The article provides: "The judges of probate of wills, and for granting letters of administration, shall hold their courts at such place or places, on fixed days, as the convenience of the people shall require. And the legislature shall from time to time, hereafter appoint such times and places; until which appointments, the said courts shall be holden at the times and places which the respective judges shall direct." We are asked, in effect, whether the Probate Courts are statutory courts the jurisdiction of which may be modified or abolished by act of the Legislature, or constitutional courts which cannot be merged into the Superior Court without a constitutional amendment.

The short answer is that "[t]he only court established by the Constitution is the Supreme Judicial Court." *Commonwealth* v. *Leach*, 246 Mass. 464, 470 (1923). Indeed, the contention that the reference to judges of probate in Part II, c. 3, art. 4, gives constitutional status to the Probate Courts was effectively rejected in *Russell* v. *Howe*, 12 Gray 147, 149 (1858), in which the court upheld a statute transferring all jurisdiction of the judges of probate and the judges of insolvency. Despite the claim of petitioner's counsel in that case that "[t]he probate court and judges of probate are recognized in the Constitution with more certainty than the supreme judicial court and the judges of that court," this court held that the jurisdiction of the old Probate Court "might be modified, enlarged,

---

[17] The only other references to Probate Courts or probate judges in the Constitution are in Part II, c. 6, art. 2, and art. 8 of the Amendments, which relate to the incompatibility of certain offices and are not relevant to the question presented.

diminished or transferred, in the same manner as the jurisdiction of all other courts subordinate to the supreme judicial court." *Id.* at 153.

Because Chief Justice Shaw died before writing out a full opinion in *Russell* v. *Howe, supra,* the published report was based on a handwritten memorandum of decision. Contemporaneous remarks of Horace Gray (then Reporter of Decisions, and later Chief Justice of the Supreme Judicial Court, and Associate Justice of the Supreme Court of the United States) are thus of particular value to our inquiry. Justice Gray wrote that "the avowed purpose of [the constitutional reference to 'judges of probate of wills'] is not to establish a particular set of judges, but merely . . . to secure to the people of the Commonwealth easy and certain access to the only courts under whose jurisdiction the family and creditors of every citizen of any property must some time come." Second and Final Report of the Judicature Commission, 6 Mass. L.Q. (No. 2) 9, 162-163 app. B (1921), quoting from H. Gray, The Power of the Legislature to Create and Abolish Courts of Justice, 21 Law Rep. 65 (June, 1858). We adopt Justice Gray's reasoning, for we find that it gives the words of the constitutional provision their most natural and obvious meaning. *Atlas Distrib. Co.* v. *Alcoholic Beverages Control Comm'n,* 354 Mass. 408, 414 (1968).

We also reaffirm the court's prior holding that the mere mention of an office in the Constitution does not necessarily endow that office with constitutional status which prevents its abolition by the Legislature. *Wales* v. *Belcher,* 3 Pick. 508 (1827). In the *Wales* case this court upheld the power of the Legislature to eliminate the jurisdiction of justices of the peace, noting that, although the office of justice of the peace is recognized in the Constitution, "the power and jurisdiction of that office is no where in that instrument limited or defined." *Id.* at 510. Similarly, the lack of any constitutional delineation of the jurisdiction of probate judges supports a conclusion that the office is not mandated by the Constitution.

Our opinion that there is no constitutional impediment

to the merger of the Probate Courts into the Superior Court is in no way contrary to or inconsistent with the force of Part II, c. 3, art. 4, of the Constitution, which has required and will continue to require that probate cases be heard "at such place or places, on fixed days, as the convenience of the people shall require." We are entitled to assume that those responsible for scheduling probate hearings "will carry out their duty under the law." *Opinion of the Justices,* 354 Mass. 804, 808 (1968).

For the foregoing reasons, we answer question 7 in the affirmative.

In summary, we answer as follows:

question 1, "No," subject to the reservation in our answer to the question;

question 2, "No";

question 3, "No";

question 4, "No," subject to the reservation in our answer to the question;

question 5, "No";

question 6, "No";

question 7, "Yes."

The foregoing answers and opinions are submitted by the Chief Justice and the Associate Justices subscribing hereto on the 31st day of May, 1977.

EDWARD F. HENNESSEY
FRANCIS J. QUIRICO
ROBERT BRAUCHER
BENJAMIN KAPLAN
HERBERT P. WILKINS
PAUL J. LIACOS
RUTH I. ABRAMS