448 Mass. 15 (2006)                                          15

Sullivan *v.* Chief Justice for Administration and Management of the Trial Court.

EDWARD J. SULLIVAN[1] & others[2] *vs.* CHIEF JUSTICE FOR
ADMINISTRATION AND MANAGEMENT OF THE TRIAL COURT.

Suffolk. September 7, 2006. - December 15, 2006.

Present: GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Chief Justice for Administration and Management. Courthouse. Practice,
Civil,* Motion to dismiss, Standing, Declaratory proceeding. *Asbestos.
Statute,* Construction. *Governmental Immunity. Court Reorganization Act.
Estoppel. Nuisance. Assault and Battery. Waiver. Supreme Judicial Court,*
Superintendence of inferior courts.

Plaintiffs alleging sufficient facts to show that they were in danger of suffer-
ing serious harm as a direct result of a purported breach by the Chief
Justice for Administration and Management of the Trial Court (CJAM) of
his statutory and common-law obligations to keep court facilities in a
reasonably safe condition had standing to bring an action against the
CJAM. [21-23]

Property management duties assigned to the Chief Justice for Administration
and Management of the Trial Court by G. L. c. 211B, § 17, were properly
the subject of a claim for declaratory relief brought by plaintiffs alleging
negligent maintenance of public property, where the enactment of G. L.
c. 258, § 10 (j) (3), implicitly waived the defense of sovereign immunity
as to those duties. [23-27]

Circumstances alleged in a complaint against the Chief Justice for Administra-
tion and Management of the Trial Court (CJAM) (specifically, that the
plaintiffs relied to their detriment on definitive, specific, and unambiguous
representations made by the CJAM, both orally and in writing, regarding
the plaintiffs' safety during renovations and asbestos abatement in the court
house in which they worked) stated a claim for estoppel on which relief
could be granted, a claim that was not barred by the doctrine of sovereign
immunity by operation of G. L. c. 258, § 10 (j) (1) [27-33], and that fell

[1]Individually and in his official capacity as clerk-magistrate of the Superior
Court in Middlesex County.

[2]Robert Moscow, individually and in his official capacity as clerk-magistrate
of the Cambridge Division of the District Court Department; and Martha
Coakley, individually and in her official capacity as district attorney for the
Northern District (Middlesex County). These plaintiffs purport to bring the
present action on behalf of themselves and more than 200 similarly situated
individuals employed at the Edward J. Sullivan Courthouse in Cambridge.
However, at no point has this case been certified as a class action. The Mas-
sachusetts Academy of Trial Attorneys is also named as a plaintiff in the first
amended complaint.

under the concurrent jurisdiction of both the Superior Court and this court [42].

Private plaintiffs could not seek injunctive relief for protection of the public health and safety, where the plaintiffs failed to allege that they had suffered a special injury of a direct and substantial character other than that which the general public shared. [33-36]

Neither Massachusetts regulations pertaining to asbestos abatement nor the relevant enabling statute, G. L. c. 149, §§ 6-6F, provided plaintiffs with a private cause of action to enforce the defendant's compliance with those laws [36-38]; further, the plaintiffs failed to demonstrate any legal authority pursuant to which they could bring an action to enforce certain Federal environmental regulations regarding asbestos [38-39].

Plaintiffs seeking relief under G. L. c. 211, § 3, for the impact on the administration of justice caused by the alleged failure of the Chief Justice for Administration and Management of the Trial Court to ensure a safe environment at the court house in which they worked, did not state a claim on which relief could be granted, where the plaintiffs did not set forth facts showing that the unsafe court house conditions prevented the courts from fulfilling their statutory or constitutional obligations. [39-41]

General superintendence by this court, as provided for in G. L. c. 211, § 3, was not the exclusive form of review of the actions or inaction of the Chief Justice for Administration and Management of the Trial Court (CJAM) in administering and managing the trial court, including the maintenance of facilities, and thus the CJAM was not immune from the filing of a private cause of action against him for the alleged unsatisfactory performance of his duties. [41-42]

This court did not view the provisos added to the second paragraph of G. L. c. 211, § 3, by St. 1992, c. 379, § 61, as limitations on this court's power to superintend the court system. [42-43]


CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 7, 2006.

The case was reported by *Greaney*, J.

*Richard M. Zielinski*, Special Assistant Attorney General, & *David A. Guberman*, Assistant Attorney General (*Richard W. Renehan*, Special Assistant Attorney General, with them) for the defendant.

*Chris A. Milne* for the plaintiffs.

SPINA, J. In this case, we consider the actions or inaction of the Chief Justice for Administration and Management of the Trial Court (CJAM) pertaining to the maintenance of the Edward J. Sullivan Courthouse (Sullivan Courthouse) in Cambridge. The thrust of the plaintiffs' complaint is that, as a direct result of the CJAM's conduct, they have suffered significant exposure to

asbestos, a highly toxic substance. On April 18, 2006, the plaintiffs filed their first amended complaint (complaint) in the Supreme Judicial Court for Suffolk County seeking declaratory and equitable relief, or, in the alternative, petitioning the Supreme Judicial Court to exercise its powers of general superintendence under G. L. c. 211, § 3. Additionally, the plaintiffs' complaint alleges claims for nuisance, assault and battery, and violations of environmental laws.[3] The CJAM filed a motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974).[4] After holding several hearings on preliminary matters, a single justice reserved and reported the following questions, pertaining to the CJAM's motion to dismiss, to the full court:

> "1. Whether some or all counts of the plaintiffs' first amended complaint must be dismissed on the grounds cited by the [CJAM] in [his] motion to dismiss, namely:
>
> "a. that the plaintiffs lack standing to bring these claims;
>
> "b. that the complaint fails to state a claim on which relief can be granted;
>
> "c. that the claims are barred by sovereign immunity.
>
> "2. Whether the first five counts of the amended complaint are barred, as the [CJAM] contend[s], for the additional reason that general superintendence by this court is the exclusive form of review of the actions or inactions of the [CJAM] in this area.
>
> "3. If one or more of the first five counts survive the motion to dismiss, whether the Superior Court has concurrent jurisdiction with this court over those counts.
>
> "4. If general superintendence by this court is the plaintiffs' exclusive remedy, whether a determination can

---

[3]No individual claims for damages have been asserted.

[4]On May 5, 2006, the plaintiffs filed a notice of voluntary dismissal of defendants Rosa Chaves, building facilities manager at the Edward J. Sullivan Courthouse, and Stephen J. Carroll, director of the court facilities bureau in the Administrative Office of the Trial Court. A single justice in the Supreme Judicial Court for Suffolk County allowed the voluntary dismissal, without prejudice, pursuant to Mass. R. Civ. P. 41 (a) (1), 365 Mass. 803 (1974).

be made on this record to dismiss count six of the amended complaint, i.e., the count seeking general superintendence.

"5. Whether the provisos added to the second paragraph of G. L. c. 211, § 3, by St. 1992, c. 379, § 61, are valid limitations on this court's inherent power to superintend the court system, and, if so, what constitutes 'extraordinary circumstances leading to a severe, adverse impact on the administration of justice' for purposes of this case."

1. *Background.* We begin with an overview of the facts as alleged in the plaintiffs' complaint, reserving additional facts for later discussion. The Sullivan Courthouse is the home of the Middlesex County district attorney's office, the Superior Court in Middlesex County, the Cambridge District Court, and the Cambridge jail. As such, the plaintiffs all have their principal places of business in the Sullivan Courthouse, or they practice law there. In the summer of 2004, the plaintiffs became concerned about the potential health effects of maintenance work, including elevator replacement and asbestos abatement in the elevator shafts and mechanical room, that was scheduled to begin in December, 2004, and to occur while the Sullivan Courthouse was occupied. The plaintiffs learned, through requests made pursuant to the Federal Freedom of Information Act, 5 U.S.C. § 552 (1996), that approximately 90,000 pounds of asbestos had been applied throughout the building as fireproofing insulation when the building was constructed in the late 1960's. Beginning in the 1980's and continuing through November, 2004, maintenance and renovation work was performed regularly without the implementation of any asbestos safety measures. These activities exposed building occupants, maintenance personnel, and outside contractors to friable asbestos,[5] without any warnings of hazardous conditions.

In May, 2000, the CJAM advised the division of capital asset management (DCAM) that the presence of asbestos in the Sullivan Courthouse may "pose a potential exposure hazard to the

_____

[5]"Friable asbestos material means any material containing more than 1 percent asbestos as determined using [a specified method] that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure." 40 C.F.R. § 61.141 (2005).

general building occupants as well as in-house maintenance workers and outside trades." The CJAM asked that asbestos "in all areas of the building" be investigated, and that DCAM undertake "all necessary steps to contain or abate the asbestos."

By 2004, a plan was being developed to perform substantial renovations to the Sullivan Courthouse, including elevator upgrades and asbestos abatement. Once they learned about this plan, the plaintiffs consulted environmental and health professionals to assess the potential health hazards posed by the renovations. In December, 2004, a report from these professionals was delivered to the CJAM and stated as follows: "Neglect on the part of building owners has allowed [unmanaged friable asbestos] to exist for years. Although problems were identified in the early 1980's, to date there has been a) no inspection and identification of asbestos-containing material in the building, b) no description of the condition of this asbestos-containing material, c) no development and implementation of an operations [and] maintenance program, and d) no informing of those at risk, with asbestos training for custodians and maintenance personnel." The report further stated that such conditions "have created an unacceptable health risk for those who work in or occupy the building." The environmental and health professionals recommended, inter alia, that all asbestos be removed immediately from the Sullivan Courthouse, that an operations and maintenance plan be developed and implemented before the commencement of the asbestos abatement, and that building occupants be relocated for the duration of the abatement.

On December 22, 2004, in response to widespread public concerns, the CJAM, along with DCAM, released the "Edward J. Sullivan Courthouse High Rise Building Action Plan and Protocol" (action plan). In this action plan, the CJAM represented that transparency would be maintained throughout the renovation process, that an asbestos operations and maintenance manual would be implemented in the next few weeks, that all information (including air sampling data) would be made available for public review, that occupants of the Sullivan Courthouse would be notified in advance of work activities in the building, and that a planned elevator project was on hold and would not proceed until discussions were first held with

building occupants about the scope of the work. Similar assurances were given by the CJAM to the house of delegates of the Massachusetts Bar Association and to the public in several press statements.

Notwithstanding the CJAM's repeated assurances, asbestos abatement occurred in the basement of the Sullivan Courthouse in January, 2006. The building's occupants were not notified about this project as required by the action plan. On February 10, a complaint was made to the division of occupational safety (division) about this work and a related elevator project. The plaintiffs were unable to obtain any information about these matters. In March, occupants of the Sullivan Courthouse learned that five elevators had failed inspection for the second time in ninety days, and that many of the building's elevators had failed their annual inspections in December, 2005. Repeated requests for information from the Administrative Office of the Trial Court (AOTC) about conditions in the Sullivan Courthouse were denied.

On April 4, 2006, the Middlesex County district attorney's office received a telephone call from the environmental coordinator at the Sullivan Courthouse, advising that work on one of the elevators would begin on April 7. The work involved "pre-cleaning" and "cable replacement operations." No information as to the specifics of the project was given to the plaintiffs, notwithstanding the presence of asbestos in the elevator shafts and mechanical rooms, and the CJAM's promises to keep the building's occupants fully informed about any maintenance projects. The plaintiffs immediately sought a temporary restraining order (TRO) in the Superior Court to stop the work. At the hearing on the TRO, a field supervisor in the asbestos and lead program of the division testified that, while he did not consider the work on the elevator shaft to be an abatement project, debris containing asbestos would be removed from the top of the elevator. Nonetheless, the plaintiffs' request for a TRO was denied, and work on the elevator proceeded as planned. The present action ensued.

2. *Standard of review.* In reviewing a motion to dismiss under rule 12 (b) (1) or (6), "we accept the factual allegations in the plaintiffs' complaint, as well as any favorable inferences reason-

448 Mass. 15 (2006) 21

Sullivan *v.* Chief Justice for Administration and Management of the Trial Court.

ably drawn from them, as true." *Ginther* v. *Commissioner of Ins.*, 427 Mass. 319, 322 (1998). See *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), and cases cited. "[A] complaint is sufficient against a motion to dismiss if it appears that the plaintiff may be entitled to any form of relief, even though the particular relief he has demanded and the theory on which he seems to rely may not be appropriate." *Id.* at 104. A motion to dismiss will be granted only where it appears with certainty that the nonmoving party is not entitled to relief under any combination of facts that he could prove in support of his claims. See *Spinner* v. *Nutt*, 417 Mass. 549, 550 (1994); *Flattery* v. *Gregory*, 397 Mass. 143, 145-146 (1986).

3. *Standing.* The CJAM contends that the plaintiffs lack standing to raise their claims because their complaint fails to show that they have suffered, or are in danger of suffering, harm as a direct result of a breach of a duty purportedly owed to them by the CJAM. In fact, the CJAM argues, the plaintiffs' complaint does not identify any legal duty owed to them by the CJAM in the first instance. Therefore, the CJAM contends that the plaintiffs' complaint must be dismissed in its entirety. We disagree.

The issue of standing is one of subject matter jurisdiction. See *Planning Bd. of Marshfield* v. *Zoning Bd. of Appeals of Pembroke*, 427 Mass. 699, 703 (1998). "To have standing in any capacity, a litigant must show that the challenged action has caused the litigant injury." *Slama* v. *Attorney Gen.*, 384 Mass. 620, 624 (1981). However, alleging "injury alone is not enough; a plaintiff must allege a breach of duty owed to [him] by the public defendant." *Northbridge* v. *Natick*, 394 Mass. 70, 75 (1985). Injuries that are speculative, remote, and indirect are insufficient to confer standing. See *Burlington* v. *Bedford*, 417 Mass. 161, 164-165 (1994). "Not every person whose interests might conceivably be adversely affected is entitled to [judicial] review." *Group Ins. Comm'n* v. *Labor Relations Comm'n*, 381 Mass. 199, 204 (1980). The complained-of injury must be a direct and ascertainable consequence of the challenged action. See *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 44 (1977). "In addition, for the plaintiff to have standing, the injury alleged must fall 'within the area of concern

22           448 Mass. 15 (2006)

Sullivan *v.* Chief Justice for Administration and Management of the Trial Court.

of the statute or regulatory scheme under which the injurious action has occurred.' " *Ginther* v. *Commissioner of Ins., supra* at 323, quoting *Penal Insts. Comm'r for Suffolk County* v. *Commissioner of Correction,* 382 Mass. 527, 532 (1981).

As is pertinent here, pursuant to G. L. c. 211B, § 9, the CJAM "in addition to his judicial duties and subject to the superintendence power of the supreme judicial court as provided in [G. L. c. 211, § 3], shall have general superintendence of the administration of the trial court, including, without limitation, the improvement of the administration of such courts and the securing of their proper and efficient administration." In order to achieve these ends, the CJAM "shall be responsible for the management of court personnel, *facilities,* administration, security, and court business and shall have the authority necessary to carry out these responsibilities" (emphasis added). G. L. c. 211B, § 9. The CJAM's duties include "the responsibility to provide facilities management, including provision of maintenance, equipment and security, [and] the responsibility to coordinate with the division of capital asset management and maintenance regarding construction, leasing, repair and designing of facilities." *Id.* at § 9 (vii).

In their complaint, the plaintiffs have alleged that, as a consequence of the CJAM's failure to fulfil his legal responsibilities under G. L. c. 211B, § 9, they have been harmed by exposure to asbestos and are in danger of suffering a correspondingly higher risk of mesothelioma.[6] Contrary to the CJAM's contentions, the plain language of G. L. c. 211B, § 9, imposes a legal duty on the CJAM to manage court facilities and to assume responsibility for the maintenance and repair of those facilities. Separate and apart from his statutory duty to the plaintiffs, the CJAM has a common-law duty of reasonable care to all lawful visitors to and occupants of the Sullivan Courthouse, including the plaintiffs. See *Mounsey* v. *Ellard,* 363 Mass. 693, 707 (1973). "A landowner must act as a reasonable man in maintaining . . . property in a reasonably safe condition in view of all the circumstances, including the likelihood of

---

[6]"Mesothelioma is a malignant tumor of the pleura, or lining of the lung, caused by exposure to asbestos dust and fibers." *Thayer* v. *Pittsburgh-Corning Corp.,* 45 Mass. App. Ct. 435, 436 n.3 (1998).

injury to others, the seriousness of the injury, and the burden of avoiding the risk."[7] *Id.* at 708, quoting *Smith* v. *Arbaugh's Restaurant, Inc.*, 469 F.2d 97, 100 (D.C. Cir. 1972), cert. denied, 412 U.S. 939 (1973).

There is no question that "asbestos is highly toxic and that the public health and welfare require strong and immediate action to abate its hazards." *Boston* v. *Keene Corp.*, 406 Mass. 301, 312 (1989). General Laws c. 211B, § 9, imposes on the CJAM the responsibility for maintaining the Sullivan Courthouse in a reasonably safe condition. The plaintiffs have alleged sufficient facts to show that they are in danger of suffering serious harm as a direct result of the CJAM's purported breach of his statutory and common-law obligations. Moreover, although the plaintiffs do not allege that they have suffered actual harm, they are "not required to wait until [they are] injured before [they] can apply to a court of equity for relief," so long as the danger is reasonably imminent. *Shaw* v. *Harding*, 306 Mass. 441, 449 (1940). Accordingly, the plaintiffs have standing to bring the present action against the CJAM.

4. *Claims for relief and sovereign immunity.* a. *Declaratory judgment.* In count 1 of their complaint, the plaintiffs seek a declaration under G. L. c. 231A that they have a right to obtain complete, accurate, and timely information about proposed work in the Sullivan Courthouse so that they can pursue appropriate recourse before any work is performed. They contend that, contrary to the CJAM's assertion, a request for declaratory relief against an administrative judicial official is not prohibited. The language of G. L. c. 231A, § 2, states that declaratory judgment "may be used . . . to enjoin and to obtain a determination of the legality of the administrative practices and procedures of any municipal, county or state agency or official." However, as the plaintiffs correctly recognize, declaratory relief

---

[7]The Massachusetts Tort Claims Act, G. L. c. 258, generally places governmental actors on the same footing as private tort defenders, with certain specified exceptions. See *Greenwood* v. *Easton*, 444 Mass. 467, 474 (2005). We note that the plaintiffs' complaint does not specifically include counts for negligence or for strict liability based on abnormally dangerous activities. See *Rylands* v. *Fletcher*, [1868] L.R. 3 H.L. 330. See also *Clark-Aiken Co.* v. *Cromwell-Wright Co.*, 367 Mass. 70, 73, 87 (1975), and cases cited. This has no bearing on the plaintiffs' standing.

"shall not apply to the governor and council or the legislative and *judicial departments*" (emphasis added). G. L. c. 231A, § 2.

"The object of all statutory construction is to ascertain the true intent of the Legislature from the words used. If a liberal, even if not literally exact, interpretation of certain words is necessary to accomplish the purpose indicated by the words as a whole, such interpretation is to be adopted rather than one which will defeat that purpose." *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996), quoting *Lehan* v. *North Main St. Garage*, 212 Mass. 547, 550 (1942). "Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with their development, their progression through the legislative body, the history of the times, [and] prior legislation . . . . General expressions may be restrained by relevant circumstances showing a legislative intent that they be narrowed and used in a particular sense." *Murphy* v. *Bohn*, 377 Mass. 544, 548 (1979), quoting *Commonwealth* v. *Welosky*, 276 Mass. 398, 401-402 (1931), cert. denied, 284 Mass. 684 (1932). Although the plain language of G. L. c. 231A, § 2, suggests a prohibition on any action for declaratory relief against the CJAM, the history of the management of court facilities and the abrogation of sovereign immunity in the maintenance of public property suggests that such a blanket prohibition was not intended by the Legislature.

General Laws c. 231A was inserted by St. 1945, c. 582, § 1, and includes only a limited waiver of sovereign immunity, permitting a declaratory judgment action as to "the legality of the administrative practices and procedures of any municipal, county or state agency or official." G. L. c. 231A, § 2. As we have noted, § 2 preserves sovereign immunity as to actions against "the governor and council or the legislative and judicial departments." At the time G. L. c. 231A was enacted, the judicial department customarily exercised inherent authority to interpret the law, ensure fair trials, promulgate rules, and administer the courts. See, e.g., *O'Coin's, Inc.* v. *Treasurer of the County of Worcester*, 362 Mass. 507, 510 (1972). Those functions were vested exclusively in the judiciary and were not to be delegated to other entities. See *id.* at 509-510. General

Laws c. 231A, § 2, plainly prohibits an action for declaratory relief against the judicial department, including the CJAM, for exercising such inherent authority. See *Sampson* v. *Committee on Probation*, 8 Mass. App. Ct. 937 (1979).

It is significant, however, for our purposes here, that the judicial department did not manage court facilities in 1945 when G. L. c. 231A was enacted.[8] The responsibility for maintaining court facilities rested primarily with the counties until 1978. See G. L. c. 34, § 3, as amended through St. 1965, c. 513; *County Comm'rs of Plymouth* v. *State Supt. of Bldgs.*, 383 Mass. 262, 263 (1981). An action for declaratory relief against a county, arising from its maintenance of court facilities, would not have been barred by G. L. c. 231A, § 2. Moreover, the county's sovereign immunity as to claims based on negligent maintenance of public property was abrogated by the enactment of the Massachusetts Tort Claims Act (Act), G. L. c. 258, § 10 (*j*) (3).

As part of the Court Reorganization Act of 1978, responsibility for the payment of "[a]ll costs of maintenance and operation of the judicial branch" was transferred to the Commonwealth. G. L. c. 29A, § 1, inserted by St. 1978, c. 478, § 12. Counties

---

[8]The management of government facilities, including those occupied by the Legislature, generally is a responsibility that has been assigned to the executive branch, which has considerable expertise in the field. See, e.g., G. L. c. 8, § 9 (pertaining to care of State House and other State buildings). However, the responsibilities of the executive branch in this area are not exclusive. The management of court facilities is essential to the business of the courts and, therefore, is a function that, in part, has been assigned to the judicial department and does not offend the separation of powers demanded by art. 30 of the Massachusetts Declaration of Rights. See *Opinion of the Justices*, 372 Mass. 883, 893-894 (1977) (this court has struck down delegation of legislative or executive powers to judiciary where delegated powers are not closely related to customary judicial activities or to operation of courts). See also G. L. c. 211B, § 17, as amended by St. 1990, c. 481, § 58 ("To the extent possible and appropriate, [the CJAM] shall delegate his duties with respect to court facilities to [the] deputy administrator for court facilities" within the division of capital asset management and maintenance, pursuant to its authority under G. L. c. 7, § 41C). Indeed, where many courts sit in facilities only partially occupied by the judiciary, it is appropriate to assign general responsibility for the management of court facilities to the executive branch, provided such management does not unduly interfere with the operations of the judicial department. See *Opinion of the Justices*, *supra* at 892. A spirit of cooperation is usually sufficient to avoid a crisis of constitutional magnitude.

remained obligated to "continue to make all payments relative to the maintenance and operations of the judicial system . . . until such time as the commonwealth provide[d] for the full funding of the judicial system," St. 1978, c. 478, § 334, but counties were entitled to reimbursement. See St. 1978, c. 478, § 333. See also *County Comm'rs of Plymouth* v. *State Supt. of Bldgs., supra.* Additionally, the Court Reorganization Act of 1978 established a procedure whereby the judicial branch could lease court houses from the counties. See G. L. c. 29A, § 4, inserted by St. 1978, c. 478, § 12.

In 1988, coincident with the gradual demise of county government, the Legislature authorized the deputy commissioner of capital planning and operations to acquire, control, and dispose of court facilities, see G. L. c. 7, § 41C, inserted by St. 1988, c. 203, § 1, and to approve all leases for court facilities negotiated by the CJAM. See G. L. c. 29A, § 4, as amended through St. 1988, c. 203, § 2. That same legislation, for the first time, placed responsibility for the "daily care, operation and routine maintenance of court facilities owned by the commonwealth" with the judicial department, and, more particularly, in the hands of the CJAM. G. L. c. 211B, § 17, inserted by St. 1988, c. 203, § 4. Notably, however, the Legislature did not include this responsibility among the extensive duties of judicial administration assigned to the CJAM in G. L. c. 211B, § 9. Instead, the Legislature designated this function separately in G. L. c. 211B, § 17. This separate statutory placement is significant because it highlights the fact that the CJAM shares responsibilities for the operation and maintenance of court facilities with the commissioner of capital asset management and maintenance. See G. L. c. 7, § 41C. In essence, with respect to this specific function, the CJAM is not acting as a member of the judicial department exercising inherent judicial authority.

As will be discussed in greater detail in a subsequent portion of this opinion, claims based on negligent maintenance of public property, including those against the CJAM, are not barred by sovereign immunity pursuant to G. L. c. 258, § 10 (*j*) (3). With that in mind, where the CJAM shares the responsibility for court facilities with nonjudicial officials who do not enjoy sovereign immunity under either G. L. c. 231A, § 2, or G. L.

c. 258, § 10 (*j*) (3), with respect to claims for negligent maintenance of public property, and where the Legislature has specifically differentiated the property management functions assigned to the CJAM under G. L. c. 211B, § 17, from his inherent judicial responsibilities set forth in G. L. c. 211B, § 9, it makes little sense to construe this body of laws as abrogating the sovereign immunity of the judicial department as to tort claims based on negligent maintenance of public property, but not as to claims for declaratory relief based on precisely the same theory.

Preference is given to a harmonious reading of statutes. See *Marco* v. *Green*, 415 Mass. 732, 736 (1993). The general theory of sovereign immunity set forth in G. L. c. 231A, § 2, can be construed harmoniously with the spirit and purpose of the specific abrogation of sovereign immunity in G. L. c. 258, § 10 (*j*) (3), as to claims based on negligent maintenance of public property. The duties of judicial administration assigned to the CJAM in G. L. c. 211B, § 9, are exempt from consideration in an action for declaratory relief because there has been no waiver of sovereign immunity as to those responsibilities. However, we conclude that the property management duties assigned to the CJAM in G. L. c. 211B, § 17, may be the subject of an action for declaratory relief because sovereign immunity implicitly has been waived as to those duties by the enactment of G. L. c. 258, § 10 (*j*) (3).

b. *Estoppel.* In count 2 of their complaint, the plaintiffs contend that, under principles of equitable or promissory estoppel, the CJAM should be precluded from reneging on his public promises of transparency regarding maintenance and repair projects at the Sullivan Courthouse. They assert that they have relied on representations made by the CJAM that he would (1) fully implement an action plan; (2) provide detailed information, including expert reports, concerning any work in the building; and (3) refrain from asbestos abatements until such time as the Sullivan Courthouse could be vacated. As such, the plaintiffs continue, the CJAM should be estopped from now failing to fulfil those promises.

"Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person

to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission."[9] *Bongaards* v. *Millen*, 440 Mass. 10, 15 (2003). See *Boylston Dev. Group, Inc.* v. *22 Boylston St. Corp.*, 412 Mass. 531, 542 (1992); *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 154-155, *S.C.*, 376 Mass. 757 (1978). See also *Libman* v. *Zuckerman*, 33 Mass. App. Ct. 341, 345-347 (1992) (developer estopped from raising statute of limitations defense where plaintiffs relied on developer's promise to repair defective work and delayed commencement of legal action). Cf. Restatement (Second) of Contracts § 90 (1981) (promise that promisor should reasonably expect to induce "action or forbearance" can be binding). "[T]he reliance of the party seeking the benefit of estoppel must have been reasonable." *Turnpike Motors, Inc.* v. *Newbury Group, Inc.*, 413 Mass. 119, 125 (1992). "[T]he doctrine of estoppel is not applied except when to refuse it would be inequitable." *Cleaveland* v. *Malden Sav. Bank*, 291 Mass. 295, 297 (1935), quoting *Boston & Albany R.R.* v. *Reardon*, 226 Mass. 286, 291 (1917). "All of the elements of estoppel must be present and the party asserting the estoppel theory 'has a heavy burden to prove that all [three] elements are present.' " *Clickner* v. *Lowell*, 422 Mass. 539, 544 (1996), quoting *Harrington* v. *Fall River Hous. Auth.*, 27 Mass. App. Ct. 301, 309 (1989).

In their complaint, the plaintiffs have alleged that, on December 22, 2004, the CJAM, along with DCAM, released the action plan, in which he represented that transparency would

---

[9]There is a difference between a claim for equitable estoppel and one for promissory estoppel. "[U]nder a theory of equitable estoppel, there must be reliance on a misrepresentation of past or present facts, while a theory of promissory estoppel permits reliance on a misrepresentation of future intent." *Boylston Dev. Group, Inc.* v. *22 Boylston St. Corp.*, 412 Mass. 531, 542 n.17 (1992). See *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 155, *S.C.*, 376 Mass. 757 (1978). Although we do not decide the matter, the theory of the plaintiffs' claim for equitable relief appears to conform more closely to one for promissory estoppel based on their allegation that they relied on the CJAM's representations that the occupants of the Sullivan Courthouse would be fully informed about potentially hazardous work as it occurred in the days, months, and years ahead. Moreover, the plaintiffs are seeking not monetary damages, but prospective injunctive relief to preclude future detrimental actions by the CJAM.

be maintained throughout the renovation project in the Sullivan Courthouse, that an asbestos operations and maintenance manual would be implemented, that all information (including air sampling data) would be made available for public review, that occupants of the Sullivan Courthouse would be notified in advance of work activities in the building, and that a planned elevator project was on hold and would not proceed until discussions were first held with building occupants about the scope of the project. In several press statements, the CJAM gave similar assurances that the health and safety of the occupants and users of the Sullivan Courthouse were "the number one priority." Apart from these public pronouncements, the plaintiffs have alleged that the CJAM's promises of transparency about all aspects of the Sullivan Courthouse project were made in writings to and at meetings with court house employees.

In reasonable reliance on the CJAM's representations and assurances, the plaintiffs allege that they refrained from initiating any legal proceedings against the CJAM. By February, 2005, the plaintiffs had sought the assistance of the house of delegates of the Massachusetts Bar Association in obtaining redress for unhealthy and unsafe work conditions at the Sullivan Courthouse, including the filing of a lawsuit against the responsible officials. However, no such action was taken because of the CJAM's ongoing promises to maintain transparency and to relocate building occupants prior to the commencement of asbestos abatement. The plaintiffs have further alleged that such abatements then occurred at the Sullivan Courthouse in April, 2005, and January, 2006. Finally, when the plaintiffs were informed in April, 2006, that elevator work, including the purported removal of asbestos, was imminent, they initiated legal proceedings against the CJAM to stop the work. By this time, they had already been subjected to the risk of irreparable harm to their health from exposure to asbestos. The plaintiffs' estoppel claim sounds in contract, the consideration for which is their alleged forbearance in bringing suit based on the CJAM's promises and assurances. Where, as here, the underlying claim is not patently frivolous and the consideration is facially reasonable, the plaintiffs are not required to allege or prove that they would have prevailed in such litigation. See *Price* v. *Price*, 348

Mass. 663, 668, cert. denied, 382 U.S. 820 (1965). Based on our reading of the plaintiffs' complaint and the reasonable inferences that can be drawn therefrom, we conclude that count 2 states a claim for estoppel on which relief could be granted.

The CJAM points out that a line of our cases stands for the proposition that we have been "reluctant to apply principles of estoppel to public entities where to do so would negate requirements of law intended to protect the public interest." *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Auth.*, 387 Mass. 687, 693 (1982). See *LaBarge* v. *Chief Admin. Justice of the Trial Court*, 402 Mass. 462, 468-469 (1988), quoting *Gamache* v. *Mayor of N. Adams*, 17 Mass. App. Ct. 291, 294 (1983) ("the doctrine of estoppel is not applied against the government in the exercise of its public duties" where to do so would impair impartiality and integrity of trial court); *Doris* v. *Police Comm'r of Boston*, 374 Mass. 443, 449 (1978) ("It would indeed be a most serious consequence if we were to conclude that the inattention or inactivity of government officials could render a statute unenforceable and thus deprive the public of the benefits or protections bestowed by the Legislature"); *New City Hotel Co.* v. *Alcoholic Beverages Control Comm'n*, 347 Mass. 539, 542 (1964) (estoppel may not be invoked against public officials if result is to defeat operation of statute). "[T]he rule against applying estoppel to the sovereign continues almost intact where a government official acts, or makes representations, contrary to a statute or regulation designed to . . . ensure some . . . legislative purpose." *McAndrew* v. *School Comm. of Cambridge*, 20 Mass. App. Ct. 356, 361 (1985). The public interest in seeing legislative policies adhered to by a governmental agency of the Commonwealth "overrides any equitable considerations." *Phipps Prods. Corp.* v. *Massachusetts Bay Transp. Auth., supra.* See *O'Blenes* v. *Zoning Bd. of Appeals of Lynn*, 397 Mass. 555, 558 (1986) (application of principles of estoppel against town zoning board inappropriate where overriding concern is strict enforcement of statutory notice requirements).

A common thread underlying our reluctance to apply principles of estoppel to public entities has been the idea that deference to legislative policy should trump individual acts or

statements of a government official that may be contrary to such policy. Otherwise, protections afforded the public interest are thwarted. Here, however, the public statements made by the CJAM were not of the sort that negated requirements of law intended to protect the public interest such that the plaintiffs should be precluded from asserting a claim for estoppel. The CJAM's representations to the plaintiffs did not impede the implementation or execution of legislative policy. For his part, the CJAM asserts that the application of estoppel would defeat a significant public interest in having the management of court facilities be under the central direction of the CJAM. See G. L. c. 211B, § 9 (vii). We believe that the public statements made by the CJAM which, in essence, expressed his desire to protect the public by ensuring safe conditions at the Sullivan Courthouse, are part and parcel of his authority to manage court facilities and would not be unduly hindered by the application of principles of estoppel.

We recognize that the Commonwealth cannot be sued unless there has been a waiver of its sovereign immunity. See *Irwin* v. *Commissioner of the Dep't of Youth Servs.*, 388 Mass. 810, 812 (1983); *Morash & Sons* v. *Commonwealth*, 363 Mass. 612, 614-616 (1973). The Massachusetts Tort Claims Act (Act), G. L. c. 258, "is such a waiver and grants subject matter jurisdiction to courts of the Commonwealth for claims against governmental entities, which historically have enjoyed sovereign immunity from such claims."[10] *Vining* v. *Commonwealth*, 63 Mass. App. Ct. 690, 691 (2005). See *Dinsky* v. *Framingham*, 386 Mass. 801, 804 (1982) ("the abrogation of the doctrine of governmental immunity by the Act simply removed the defense of immunity in certain tort actions against the Commonwealth, municipalities and other governmental subdivisions"). General

---

[10]Pursuant to G. L. c. 258, § 4, "[a] civil action shall not be instituted against a public employer on *a claim for damages* under this chapter unless the claimant shall have first presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose, and such claim shall have been finally denied by such executive officer in writing and sent by certified or registered mail, or as otherwise provided by this section" (emphasis added). This presentment requirement is not applicable here because the plaintiffs have not asserted any claims for damages. They request only declaratory and equitable relief.

Laws c. 258, § 2, states, in pertinent part, that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances . . . ."

At the same time, this broad waiver of sovereign immunity is subject to certain exceptions. General Laws c. 258, § 10 (*j*), preserves the Commonwealth's sovereign immunity with respect to "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." Arguably, the "harmful consequences of a condition or situation" here originally *were* caused by the public employer when it had 90,000 pounds of asbestos applied throughout the Sullivan Courthouse. That being the case, the Commonwealth's sovereign immunity would not be preserved by the operation of G. L. c. 258, § 10 (*j*).

If we were to conclude that the "harmful consequences of a condition or situation" were *not* originally caused by the public employer, then the Commonwealth's sovereign immunity would still not be preserved under § 10 (*j*). This statutory exception to the broad waiver of the Commonwealth's sovereign immunity does not apply to "any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim . . . by a public employee, provided that the injury resulted in part from reliance on those assurances." G. L. c. 258, § 10 (*j*) (1). The CJAM's various assurances to the plaintiffs, made both orally and in the action plan, about the renovations and asbestos abatement project in the Sullivan Courthouse were definitive, specific, and free of ambiguity. See *Lawrence* v. *Cambridge*, 422 Mass. 406, 410 (1996) (summary judgment for municipality not appropriate where there was genuine issue of material fact as to whether municipality's promise to protect plaintiff from harm was suf-

ficiently explicit and specific to render municipality liable for plaintiff's injuries). Contrast *Campbell* v. *Boston Hous. Auth.*, 443 Mass. 574, 585-586 (2005) (verbal statements by Boston Housing Authority did not constitute explicit and specific assurances that premises were free of lead paint hazards so as to destroy Authority's immunity from suit under G. L. c. 258, § 10 [*f*]). If proved, the allegations set forth in the plaintiffs' complaint as to the CJAM's representations of safety would not be barred by sovereign immunity in accordance with G. L. c. 258, § 10 (*j*) (1).

Further, the exception set forth in § 10 (*j*) does not apply to "any claim based on negligent maintenance of public property." G. L. c. 258, § 10 (*j*) (3). While the plaintiffs' complaint does not specifically include a count for negligence, the thrust of their complaint is negligent maintenance of the Sullivan Courthouse by the CJAM. If proved, such allegations would not be barred by sovereign immunity in accordance with G. L. c. 258, § 10 (*j*) (3).

As part of their request for equitable relief, the plaintiffs seek to obtain from the CJAM "any and all information bearing in any manner on any proposed work at the Sullivan Courthouse so they may decide for themselves whether the risk to their life and safety is acceptable to them." The CJAM contends that the plaintiffs have no right to any such documents in his possession. He asserts that judicial records are not "public records" within the meaning of G. L. c. 4, § 7, Twenty-sixth, and, therefore, are not subject to public disclosure. See G. L. c. 66, § 10. At this juncture, we are only deciding whether the plaintiffs have alleged sufficient facts in support of their estoppel claim to withstand a motion to dismiss. The plaintiffs' allegations with respect to this particular claim focus on the CJAM's public statements about the Sullivan Courthouse work. It is premature for us to decide whether the documents sought by the plaintiffs are "public records" subject to disclosure.[11]

c. *Nuisance.* In count 3 of their complaint, the plaintiffs

---

[11]We note that discovery, by its nature, is quite broad. See Mass. R. Civ. P. 26 (b) (1), 365 Mass. 772 (1974). "The public records law does not restrict this breadth." *Matter of a Subpoena Duces Tecum*, 445 Mass. 685, 691 (2006). See *Boston Police Superior Officers Fed'n* v. *Boston*, 414 Mass. 458, 465-466 (1993).

contend that the widespread presence of asbestos in the Sullivan Courthouse, much of it in locations where it can be and has been dislodged by building maintenance, and the improper handling of such material, with serious consequent health risks to the building's occupants, constitute an unabated public nuisance. They further allege that unmanaged water leaks and chronically malfunctioning elevators, the repair of which involves the disturbance of friable asbestos in the elevator shafts and the adjacent mechanical rooms, are contributing to the public nuisance. The plaintiffs assert that they have suffered an injury distinct from the public at large because, unlike the public at large, they have been unduly exposed to asbestos fibers over a long period of time, putting them at higher risk for mesothelioma. The plaintiffs seek injunctive relief for protection of the public health and safety.

We have stated that "[a] nuisance is public when it interferes with the exercise of a public right by directly encroaching on public property or by causing a common injury." *Connerty* v. *Metropolitan Dist. Comm'n*, 398 Mass. 140, 148 (1986). See Restatement (Second) of Torts § 821B (1979) ("A public nuisance is an unreasonable interference with a right common to the general public"). In determining whether there has been an unreasonable interference with a public right, a court may consider, inter alia, "[w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience . . . ." *Id.* "In an action for [an] injunction the question is whether the activity itself is so unreasonable that it must be stopped." Restatement (Second) of Torts, *supra* at § 821B comment i, at 93.

Not just any plaintiff can bring a public nuisance action. "An information in equity by the Attorney General is the normal remedy for the abatement of a public nuisance." *Mayor of Cambridge* v. *Dean*, 300 Mass. 174, 175 (1938). See *Everts* v. *Wine Cellar, Inc.*, 308 Mass. 599 (1941) (where illuminated sign projected beyond building line, remedy must be sought by public authorities, not neighbors); *Wesson* v. *Washburn Iron Co.*, 13 Allen 95, 103 (1866) (public nuisance remedied by public prosecution). However, a private plaintiff will be allowed

to maintain a public nuisance action where that plaintiff can "show that the public nuisance has caused some special injury of a direct and substantial character other than that which the general public shares." *Connerty* v. *Metropolitan Dist. Comm'n, supra.* See *Planned Parenthood League of Mass., Inc.* v. *Bell,* 424 Mass. 573, 578-579, cert. denied, 522 U.S. 819 (1997) (Planned Parenthood could bring public nuisance action on behalf of patients who sustained special injury in nature of interference with right to obtain abortion); *Dartmouth* v. *Silva,* 325 Mass. 401, 404 (1950) ("where the interference with a public right of way is of such a nature that a town may be put to expense in repairing the way, or may be liable for damage sustained from its obstruction, it has been held that such a suit may be maintained by the town"). See also *Lewis* v. *General Elec. Co.,* 37 F. Supp. 2d 55, 61 (D. Mass. 1999) (pollution contamination constituted interference with public health and environment, and plaintiff's inability to sell property represented special injury). Where a private plaintiff asserts a claim for public nuisance, "[i]t is not enough that he has suffered the same kind of harm or interference but to a greater extent or degree." Restatement (Second) of Torts, *supra* at § 821C comment b, at 95. Absent a special injury of a direct and substantial character, "the remedy for a public nuisance must be sought by public authorities." *Connerty* v. *Metropolitan Dist. Comm'n, supra.*

Here, the claim against the CJAM for public nuisance has been brought by the plaintiffs, not by the Attorney General as the public officer vested with the authority to protect the public interest.[12] See G. L. c. 12, § 3. See also *Attorney Gen.* v. *Trustees of Boston Elevated Ry.,* 319 Mass. 642, 652-653 (1946). However, in their complaint, the plaintiffs have failed to allege

---

[12]The plaintiffs have not asserted in their complaint that they have standing to sue for public nuisance as citizens in a citizen's action. See, e.g., G. L. c. 29, § 63 (allowing not less than twenty-four taxable inhabitants to file petition in equity to prevent unlawful expenditure of public funds by officer of Commonwealth); *Sears* v. *Treasurer & Receiver Gen.,* 327 Mass. 310, 315 (1951) (stating that "public right" doctrine allows citizens to bring action for relief in nature of mandamus to procure enforcement of public duty). Furthermore, the plaintiffs are not, to date, members of a certified class in a class action lawsuit. See Restatement (Second) of Torts § 821C (1979).

how they have suffered a special harm that is different in kind from that suffered by other members of the public enjoying the same common right, namely, the preservation of their health and safety. The plaintiffs do allege that, as a result of the CJAM's failure properly to manage the asbestos in the Sullivan Courthouse, they have been exposed to a highly toxic substance over a substantial period of time and been placed at great risk for developing mesothelioma. Notwithstanding the severity of this alleged injury, the harm is the same in kind as that suffered by other members of the public who are exposed to the environmental conditions at the Sullivan Courthouse. While individuals employed by particular organizations housed in the building may face the greatest exposure, other members of both the legal community and the general public may very well spend significant periods of time in the Sullivan Courthouse and face the same kind of harm. Because the plaintiffs have not alleged a special injury of a direct and substantial character other than that which the general public shares, a public nuisance action can only be brought by the Attorney General.[13] Accordingly, count 3 of the plaintiffs' complaint fails to state a claim on which relief can be granted.

d. *Assault and battery.* In count 4 of their complaint, the plaintiffs contend that the actions or inaction of the CJAM have subjected the plaintiffs to asbestos exposure and to chronically malfunctioning elevators, constituting assault and battery. We deem this claim waived, as the plaintiffs have failed to address it in their brief before this court.[14] See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). See also *Travenol Labs., Inc.* v. *Zotal, Ltd.,* 394 Mass. 95, 97 (1985).

e. *Violations of environmental laws.* In count 5 of their complaint, the plaintiffs contend that the CJAM has violated laws and regulations designed to protect the environment and the health and safety of the plaintiffs by failing to provide notice of asbestos abatements, by failing to exclude all persons

---

[13]In light of our resolution of this issue, we need not decide whether the plaintiffs' claim for public nuisance is barred by the doctrine of sovereign immunity.

[14]In light of our resolution of this issue, we need not decide whether the plaintiffs' claim for assault and battery is barred by the doctrine of sovereign immunity.

not involved in such abatements from the "work area," by failing to provide asbestos awareness training for occupants of the Sullivan Courthouse, and by failing to comply with mandated safety precautions. See 453 Code Mass. Regs. §§ 6.00 (1998) (requirements for removal, containment, or encapsulation of asbestos). See also 29 C.F.R. § 1926.1101 (2005) (Occupational Safety and Health Administration regulations for asbestos); 40 C.F.R. § 61.145 (2005) (asbestos emission standards for demolition and renovation). As a consequence, the plaintiffs assert that they have suffered the harm that these statutes and regulations were designed to prevent, namely undue exposure to asbestos.

Massachusetts regulations pertaining to the removal, enclosure, encapsulation, or disturbance of asbestos, promulgated in accordance with and under the authority of G. L. c. 149, §§ 6-6F, set forth two enforcement provisions. First, the director of the Massachusetts Department of Labor and Workforce Development, "upon determination that there is a violation of any work place standard which compromises the protection of the general public or the occupational health and safety of workers . . . may order any worksite to be closed by way of the issuance of a cease and desist order enforceable in the appropriate courts of the Commonwealth." 453 Code Mass. Regs. § 6.16 (1) (1998). See G. L. c. 149, § 6E. Second, "[a]ny person, firm, corporation, or other entity who or which violates the provisions of 453 [Code Mass. Regs. §] 6.00 shall be subject to the administrative sanctions specified [therein] and any civil penalty allowed by the laws of the Commonwealth, and, pursuant to []G. L. c. 149, § 6F, may be punished by a fine of not less than $500 and not more than $1500 for each offense." 453 Code Mass. Regs. § 6.17 (2) (1998). See G. L. c. 149, § 6F. More broadly, except as otherwise specifically provided, the Attorney General shall enforce the provisions of G. L. c. 149, pertaining to the Department of Labor and Industries, and "shall have all necessary powers therefor." G. L. c. 149, § 2. The Attorney General "shall receive all complaints concerning conditions existing in any industry carried on in the [C]ommonwealth, or concerning alleged violations of any laws enforced under his direction, and shall thereupon make or direct all needful and appropriate investigations and prosecutions." G. L. c. 149, § 5.

Neither the Massachusetts regulations relied on by the plaintiffs nor the enabling statute provides the plaintiffs with a private cause of action to enforce the CJAM's compliance with their mandates. "[A] clear legislative intent is necessary to infer a private cause of action from a statute." *Loffredo* v. *Center for Addictive Behaviors*, 426 Mass. 541, 543 (1998). See *Lindsey* v. *Massios*, 372 Mass. 79, 84-85 (1977) (safety statute not construed as establishing new individual right of action without clear legislative expression of such intent); *Local 1445, United Food & Commercial Workers Union* v. *Police Chief of Natick*, 29 Mass. App. Ct. 554, 558 (1990) (where "the power to seek injunctions is expressly conferred upon specified public officers, we may assume that the Legislature did not intend to create . . . private attorney general rights"). Further, "a private cause of action cannot be inferred solely from an agency regulation." *Loffredo* v. *Center for Addictive Behaviors, supra* at 546. Here, we discern no legislative intent to create a private cause of action to enforce environmental laws that the plaintiffs seek to have recognized.

Similarly, enforcement of 29 C.F.R. § 1926.1101, a regulation promulgated pursuant to the Occupational Safety and Health Act (OSHA), 29 U.S.C. §§ 651-678 (2000), is reserved for the United States Secretary of Labor. See 29 U.S.C. § 658 (authorizing Secretary to issue citations for violations of occupational safety and health standards and to establish reasonable time for abatement); 29 U.S.C. § 662 (authorizing Secretary to file petition for injunctive relief to restrain imminent workplace dangers). See also 29 U.S.C. § 666 (authorizing occupational safety and health review commission to assess civil penalties for violations of occupational safety and health standards). "OSHA does not create a private cause of action." *Cabana* v. *Forcier*, 148 F. Supp. 2d 110, 115 (D. Mass. 2001). See *Wickham* v. *American Tokyo Kasei, Inc.*, 927 F. Supp. 293, 295 (N.D. Ill. 1996) (OSHA is regulatory enactment that creates no private right of action and is enforced by fines or criminal prosecution).

Finally, the plaintiffs seek to assert an action for alleged noncompliance with asbestos emission standards for demolition and renovation as set forth in 40 C.F.R. § 61.145, a regulation

promulgated under the Federal Clean Air Act (Act), 42 U.S.C. §§ 7401-7671q (2000), a complex and comprehensive legislative scheme for protecting and improving the nation's air quality. See 42 U.S.C. § 7401 (enunciating purposes of Act). See also *Sierra Club* v. *Larson*, 2 F.3d 462, 464 (1st Cir. 1993). However, it is the administrator of the Environmental Protection Agency, or his authorized representative, who is vested with the authority to enforce the provisions of the Act by issuing compliance orders, ordering administrative penalties, or bringing a civil action. See 42 U.S.C. § 7413 (Federal enforcement). Individual plaintiffs are not entirely without recourse for addressing the problems of environmental pollution. Citizen suits, brought pursuant to 42 U.S.C. § 7604, play an important role in the enforcement scheme of the Act. See *Weiler* v. *Chatham Forest Prods., Inc.*, 392 F.3d 532, 536 (2d Cir. 2004). However, the plaintiffs here have not alleged that they have satisfied the necessary criteria for bringing a citizen suit under § 7604 (a).

In the absence of any legal authority pursuant to which the plaintiffs can bring an action to enforce the environmental laws on which they rely, we conclude that count 5 of the plaintiffs' complaint fails to state a claim on which relief can be granted.

f. *General superintendence.* In count 6 of their complaint, the plaintiffs contend that this court should exercise its powers of general superintendence under G. L. c. 211, § 3,[15] to redress the severe, adverse impact on the administration of justice caused by the CJAM's alleged failure to ensure a safe work environment in the Sullivan Courthouse. We disagree.

---

[15]General Laws c. 211, § 3, provides, in pertinent part:

"The supreme judicial court shall have general superintendence of all courts of inferior jurisdiction to correct and prevent errors and abuses therein if no other remedy is expressly provided; and it may issue all writs and processes to such courts and to corporations and individuals which may be necessary to the furtherance of justice and to the regular execution of the laws.

"In addition to the foregoing, the justices of the supreme judicial court shall also have general superintendence of the administration of all courts of inferior jurisdiction . . . and it may issue such writs, summonses and other processes and such orders, directions and rules as may be necessary or desirable for the furtherance of justice, the regular execution of the laws, the improvement of the administration of such courts, and the securing of their proper and efficient administration . . . ."

Relief pursuant to G. L. c. 211, § 3, "is extraordinary and will be exercised only in the most exceptional circumstances." *Campiti* v. *Commonwealth*, 417 Mass. 454, 455 (1994). A party seeking such relief "must demonstrate both a substantial claim of violation of his substantive rights and error that cannot be remedied under the ordinary review process." *Dunbrack* v. *Commonwealth*, 398 Mass. 502, 504 (1986). "We have repeatedly held that relief under G. L. c. 211, § 3, is properly denied where there are other routes by which the petitioning party may adequately seek relief." *Sabree* v. *Commonwealth*, 432 Mass. 1003, 1003 (2000).

The CJAM has been vested with the responsibility for maintaining and repairing the court houses of the Commonwealth. See G. L. c. 211B, § 9 (vii). Under G. L. c. 211, § 3, this court's power of general superintendence "shall not include the authority or power to exercise or supersede any of the powers, duties and responsibilities of the [CJAM] . . . except under extraordinary circumstances leading to a severe, adverse impact on the administration of justice." In their complaint, the plaintiffs have not alleged how the CJAM's conduct has had "a severe, adverse impact on the administration of justice" such that they would be entitled to relief from this court under G. L. c. 211, § 3. The plaintiffs have not set forth facts showing that unsafe conditions at the Sullivan Courthouse have prevented the Superior Court or the Cambridge District Court from fulfilling their statutory or constitutional obligations. The Sullivan Courthouse remains open for business, and justice continues to be administered.

The circumstances here are different from those that characterized the Chelsea Division of the District Court Department that was closed by order of this court "when its condition had deteriorated to the point that the facility was uninhabitable and had been condemned by local health officials." *County of Barnstable* v. *Commonwealth*, 422 Mass. 33, 46 n.14 (1996). Plainly, the allegations in the plaintiffs' complaint paint a grim picture of working conditions in the Sullivan Courthouse and the health concerns expressed by the plaintiffs should not be minimized. However, the plaintiffs have not been entirely foreclosed from obtaining relief where they may proceed with

their estoppel claim. See *County of Barnstable* v. *Commonwealth*, 410 Mass. 326, 333 (1991) (transfer of case from single justice session to Superior Court allowed parties to state claims and develop record and provided more appropriate basis for determining necessity of G. L. c. 211, § 3, relief). The exercise of this court's general superintendence under G. L. c. 211, § 3, is not appropriate at this juncture. Accordingly, count 6 of the plaintiffs' complaint fails to state a claim on which relief can be granted.

5. *General superintendence as exclusive review.* The CJAM contends that the relief sought by the plaintiffs directly infringes on his authority to administer and manage the trial court, including the maintenance of facilities, under G. L. c. 211B, § 9. He asserts that general superintendence by the Justices of this court, pursuant to G. L. c. 211, § 3, is the exclusive form of review of his actions or inaction as CJAM. We disagree.

The CJAM "possesses not only that authority specifically granted to him by statute, but also the authority to employ all ordinary means reasonably necessary for the full exercise of the powers granted to him and the duties imposed upon him." *Clerk of the Superior Court for the County of Middlesex* v. *Treasurer & Receiver Gen.*, 386 Mass. 517, 522 (1982). See G. L. c. 211B, § 9. In enunciating the powers and duties of the CJAM, the Legislature has stated that the CJAM's administration and management of the trial court is subject to "the superintendence power of the supreme judicial court as provided in [G. L. c. 211, § 3]." G. L. c. 211B, § 9. We interpret G. L. c. 211, § 3, "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975), quoting *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975). Notwithstanding the powers of general superintendence conferred on this court, nothing in G. L. c. 211, § 3, suggests that the CJAM is immune from the filing of a private cause of action against him for the alleged unsatisfactory

performance of his duties. Indeed, our discussion pertaining to count 6 of the plaintiffs' complaint supports this proposition. In the absence of such an expression of legislative intent, we shall not infer it. Moreover, the initiation of an action like the one brought by the plaintiffs here does not in any way diminish this court's powers of general superintendence as will be discussed further in the last portion of this opinion.

6. *Jurisdiction*. We conclude that the Superior Court has concurrent jurisdiction with this court over the plaintiffs' claim for estoppel in count 2 of their complaint. General Laws c. 214, § 1, states that the "supreme judicial and superior court shall have original and concurrent jurisdiction of all cases and matters of equity cognizable under the general principles of equity jurisprudence and, with reference thereto, shall be courts of general equity jurisdiction." This language plainly confers jurisdiction over the plaintiffs' remaining viable claim on the Superior Court.

7. *Validity of provisos in G. L. c. 211, § 3*. We are asked to consider whether the provisos added to the second paragraph of G. L. c. 211, § 3, by St. 1992, c. 379, § 61,[16] are valid limitations on this court's inherent power to superintend the court system, and, if so, what constitutes "extraordinary circumstances leading to a severe, adverse impact on the administration of justice" for purposes of this case.

Any legislation that purports to divest the Supreme Judicial Court of its inherent powers of judicial administration "would be ineffective as beyond the power of the General Court." *Opinion of the Justices*, 372 Mass. 883, 889 (1977). "Inherent powers of the courts are those 'whose exercise is essential to the function of the judicial department, to the maintenance of its authority, or to its capacity to decide cases.' " *Brach* v. *Chief Justice of the Dist. Court Dep't*, 386 Mass. 528, 535 (1982), quoting *Sheriff of Middlesex County* v. *Commissioner of Cor-*

---

[16]Pursuant to St. 1992, c. 379, § 61, general superintendence of the administration of all courts of inferior jurisdiction by the Justices of the Supreme Judicial Court "shall not include the authority or power to exercise or supersede any of the powers, duties and responsibilities of the chief justice for administration and management, as established by [G. L. c. 211B, § 1,] in any general or special law except under extraordinary circumstances leading to a severe, adverse impact on the administration of justice."

*rection*, 383 Mass. 631, 636 (1981). "The inherent authority of the judiciary 'is not limited to adjudication, but includes certain ancillary functions, such as rule-making and judicial administration, which are essential if the courts are to carry out their constitutional mandate.' " *Opinion of the Justices, supra* at 892-893, quoting *O'Coin's, Inc.* v. *Treasurer of the County of Worcester*, 362 Mass. 507, 510 (1972).

We do not view the provisos added to the second paragraph of G. L. c. 211, § 3, by St. 1992, c. 379, § 61, as limitations on this court's inherent power to superintend the court system. The powers and duties of the CJAM are extensive and diverse. See G. L. c. 211B, § 9. To some extent, those powers and duties are purely administrative and do not directly implicate the essential functioning of the judicial department. See, e.g., G. L. c. 211B, § 9 (v) (authority to approve expenditures for libraries); G. L. c. 211B, § 9 (xv) (responsibility to provide recommendations on management of judicial recall process); G. L. c. 211B, § 9 (xvi) (responsibility to supervise implementation of continuing education programs). In these instances, the CJAM's actions will not be subject to general superintendence by this court, in accordance with the provisos set forth in G. L. c. 211, § 3. However, when the CJAM's exercise of his authority would have a severe, adverse impact on the administration of justice, that circumstance would constitute an infringement on the inherent powers of judicial administration, and the CJAM's actions would be subject to the general superintendence of the Justices of the Supreme Judicial Court. The provisos added to the second paragraph of G. L. c. 211, § 3, by St. 1992, c. 379, § 61, make this distinction. Where the administration of justice is in jeopardy, from whatever source, including the deterioration of court facilities to the extent that the judiciary is unable to fulfil its statutory or constitutional mandates, there is no limitation on this court's inherent judicial authority. Beyond that, we need not determine more specifically, in the abstract, what constitutes "extraordinary circumstances leading to a severe, adverse impact on the administration of justice."

8. *Conclusion.* We answer the reported questions as follows:

The answer to question 1a is, "No. The plaintiffs have standing to bring the claims set forth in their complaint."

The answer to question 1b is, "Yes, in part. The plaintiffs' complaint fails to state claims for nuisance (count 3), assault and battery (count 4), violations of environmental laws (count 5), and general superintendence (count 6). As such, those counts must be dismissed. The plaintiffs' complaint does state claims for declaratory relief (count 1) and for estoppel (count 2). As such, those counts shall not be dismissed."

The answer to question 1c is, "In light of our answer to question 1b, we need not decide whether the plaintiffs' claims for nuisance and for assault and battery are barred by sovereign immunity. The plaintiffs' claim for estoppel is not barred by sovereign immunity."[17]

The answer to question 2 is, "No. General superintendence by this court pursuant to G. L. c. 211, § 3, is not the exclusive form of review of the actions or inaction of the CJAM in this area."

The answer to question 3 is, "Yes. The Superior Court has concurrent jurisdiction with this court over the plaintiffs' claim for estoppel."

The answer to question 4 is, "In light of our answer to question 2, we need not answer this question."

The answer to question 5 is, "We do not view the provisos added to the second paragraph of G. L. c. 211, § 3, by St. 1992, c. 379, § 61, as limitations on this court's inherent power to superintend the court system."

This case is remanded to the Supreme Judicial Court for Suffolk County for further proceedings consistent with this opinion.

*So ordered.*

---

[17]In his motion to dismiss, the CJAM only asserts that the plaintiffs' claims for nuisance and for assault and battery are barred by sovereign immunity.