Agostini, John A., J.
A. Background 
In this insurance coverage action brought by the Roman Catholic Bishop of Springfield (the Diocese), the defendant insurer North Star Reinsurance Corporation (North Star) issued a subpoena requesting documents which are in the custody of the Hampden State Police Detective Unit. In response to North Star’s subpoena, Captain Peter Higgins, on behalf of the State Police, has moved for a protective order requesting that the documents identified in Exhibits A through D attached to his motion not be disclosed because (1) they contain investigatory materials regarding an open murder investigation, (2) some are confidential reports of sexual assault, and (3) the requests are overly broad and burdensome.
The Court has carefully reviewed the materials attached to Captain Higgins’s motion for a protective order. Exhibit A lists and contains statements from 38 witnesses gathered by police as part of the investigation into the 1972 murder of 13-year-old altar boy Danny Croteau. The main suspect in that murder has been former Springfield Diocesan priest Richard Lav-igne, who has also been the target of numerous allegations of sexual abuse and who in 1992 pled guilty to charges of indecent assault and battery. Several of the statements in Exhibit A are from individuals reporting Lavigne’s sexual abuse of them. Captain Higgins states that his office and the Hampden County District Attorney’s office have already provided the defendants the statements from eight of these 38 witnesses, after redacting the statements to protect the privacy of sexual abuse victims.[2] Some of these eight statements which have already been given to the defendants, along with some others listed by Captain Higgins, are among those already available for public inspection, apart from redactions to conceal information identifying sexual abuse victims, pursuant to a 2003 order by Superior Court Justice Peter A. Velis modifying a prior impoundment order (the modification order) in another action. See The Republican Company v. Appeals Court, 442 Mass. 218 (2004).[3] The documents in Exhibit A which have clearly not been disclosed, either through discovery in this action or under the modification order, are the statements of about nine witnesses taken after September 2, 1993.
Exhibit B to Captain Higgins’s motion for a protective order is a four-page list of documents gathered by the State Police in connection with investigations into 15 cases of sexual abuse allegedly perpetrated by 18 priests and/or deacons affiliated with the Diocese. This list references a wide range of documents, including communications from religious orders and the victims’ legal counsel, medical and police reports, and diocesan sexual abuse intake sheets. Exhibit C is a one-page document entitled Communications With the Diocese, and it lists eight communications, seven of which are between counsel for the Diocese and the office of Hampden County District Attorney Bennett, and one which refers to three Diocese of Springfield Sexual Abuse Intake Sheets. Exhibit D is a two-page document identifying seven categories of materials, many of which have been disclosed to the public under the modification order, such as the rulings and documents generated in connection with the 1993 search warrant application. Exhibit D also refers to some documents filed in connection with the 1993 search warrant application (see footnote 3) which are duplicated elsewhere in Exhibits A through D.
Following a hearing on Captain Higgins’s motion for a protective order, North Star agreed to reduce the scope of its request to the following materials:
All witness statements concerning or relating to allegations of sexual abuse by or against any official, member, or employee of the Springfield Diocese.
North Star clarified at the motion hearing that it is not interested in obtaining documents pertaining to blood tests, DNA evidence, or autopsy reports. Therefore, although the motion for a protective order was filed in response to a subpoena seeking eleven categories of documents, the Court addresses Captain Higgins’s arguments as they apply to North Star’s narrowed request.
*526 B. Discussion
Protective orders are governed by Mass.R.Civ.P. 26(c), which provides that
Upon motion by . . . the person from whom discovery is sought, and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms or conditions . . . ; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters . . .
1. Investigatory Materials
Captain Higgins first argues that the documents in Exhibit A are investigatory materials exempt from disclosure under G.L.c. 4, §7, Twenty-sixth (f), which excludes from the definition of public records
investigatory materials necessarily compiled out of the public view by law enforcement or other investigatory officials, the disclosure of which materials would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest.
This argument is problematic for two reasons: First, the investigatory materials exemption to the public records law does not limit discovery in civil actions. See Sullivan v. Chief Justice for Administration and Management of the Trial Court, 448 Mass. 15, 33 n. 11 (2006) (public records law does not restrict the breadth of discovery); Matter of Subpoena Duces Tecum, 445 Mass. 685, 691 (2006) (same).
Second, the documents requested by North Star do not come within the category of materials protected by the investigatory materials exemption. Among the public policy concerns underlying this exemption are “the prevention of disclosure of confidential investigative techniques, procedures, or sources of information, [and] the encouragement of individual citizens to come forward and speak freely with police concerning matters under investigation.” District Attorney for the Norfolk District v. Flatley, 419 Mass. 507, 512 (1995), quoting Bougas v. Chief of Police of Lexington, 371 Mass. 59, 62 (1976). Whether these documents are entitled to this exemption is determined on a case-by-case basis, and the custodian of the records, here the Hampden State Police Detective Unit, has the burden of proving with specificity the applicability of the exemption. See District Attorney for the Norfolk District v. Flatley, 419 Mass. at 511-12; Rafuse v. Stryker, 61 Mass.App.Ct. 595, 597 (2004).
Contrary to Captain Higgins’s arguments, there are no real signs of an active investigation into the 1972 Croteau murder. The records submitted indicate that the last such investigatory activity by police occurred in 2004.[4] Judge Velis’s rejection of the “ongoing investigation” argument in 2003 remains sound, despite additional evidence collected between September 1993 and 2004. Captain Higgins’s bare claim that giving the defendants these materials would prejudice an ongoing, open murder investigation is belied by the fact that many of documents identified in Exhibits A through D have already been made available to the defendants, either pursuant to the modification order or through discovery in this action. There is no merit to Captain Higgins’s assertion that the eight witness statements in Exhibit A which have already been given to the defendants as part of the discovery in this action do not concern the “open investigation into the Daniel Croteau homicide, but deal with sexual abuse allegations only." These statements were taken as part of the murder investigation and many refer to both the murder and sexual abuse of the witnesses.[5] It defies logic for Captain Higgins to argue that the release of witness statements regarding the Croteau murder would prejudice that investigation, and yet at the same time give the defendants some of those statements which had not previously been disclosed.
None of the statements in Exhibit A appear to reveal any confidential investigative techniques or procedures, nor does Captain Higgins even attempt to make any specific argument on this point. To the extent that the materials in Exhibit A identify sources of information, such as the witnesses who reported seeing Lav-igne at the murder scene on the night of the murder, most of those witnesses stated that they had already discussed what they witnessed with friends, family members and/or acquaintances. Therefore, I find that preventing disclosure of their statements would not prevent disclosure of information that is already known to others. See In the Matter of a Subpoena Duces Tecum, 445 Mass. at 690 (denying district attorney’s motion to quash subpoena seeking videotaped interviews of sexual abuse victims, where individuals other than law enforcement officials had viewed videotape or been present for videotaping, so that preventing disclosure of videotapes would not prevent disclosure of information). One witness who did not indicate in her statement that she had discussed what she had seen on the night of the murder with others, apart from her therapist, gave her statement to police in April 2000, and, according to Exhibit D, was interviewed again by police on August 27, 2002. The time lapse since then, combined with this witness’s connection with another witness who gave police a statement regarding Lavigne’s presence at the murder scene, weakens any potential argument that disclosure of this information would prejudice the possibility of effective law enforcement with respect to this murder investigation.[6]
At this juncture, over 35 years after the murder, Captain Higgins has advanced no reason to conclude that disclosing these documents now would discourage other witnesses from coming forward. Instead, I find that the opposite would more likely be true. Some *527 of those who have given police statements about seeing Lavigne on the night of the murder had been discouraged from doing so by family members, the district attorney in 1972, or acquaintances; others waited due to fear of what the police might do or because they suffered post-traumatic stress disorder from what they state they witnessed.[7] Some realized or remembered what they had witnessed, and its significance, when the investigation received renewed public attention in and after 1993. These witnesses waited for decades to overcome the circumstances which contributed to their silence, and they expressed relief in making their statements. I find that, if anything, the disclosure of their statements would likely give others with relevant information, if any existed, the courage and support to come forward.
Captain Higgins also argues that the documents listed in Exhibit D are investigatory. Captain Higgins has done nothing to meet his burden of showing with any specificity that they are entitled to the investigatory materials exemption under G.L.c. 4, §7, Twenty-sixth (f). See Rafuse v. Stryker, 61 Mass.App.Ct. at 561. In any event, much of what is listed in Exhibit D is either no longer sought by North Star or is already available to North Star. Several items listed in Exhibit D are medical or scientific reports and items which do not constitute witness statements. Large portions of the remaining documents listed in Exhibit D, such as the materials listed under “Search Warrants,” are publicly available at the Hampden County Superior Court Clerk’s Office and therefore need not be produced by Captain Higgins to North Star.
The as-yet undisclosed materials in Exhibit D do not generally raise concerns about sharing investigative information with North Star or the other insurer defendants. One document in Exhibit D, however, which may contain sensitive information about confidential investigative techniques or procedures is Captain Higgins’s Investigative Summary dated April 12, 2004. Although the Croteau murder investigation is at a standstill and Captain Higgins has failed to argue specifically how disclosure of this document to the defendants would not be in the public interest, he may submit it to the Court for an in camera inspection to determine if there is any risk that its disclosure to North Star would not be in the public interest. In sum, Captain Higgins has not met his burden of establishing the applicability of G.L.c. 4, §7, Twenty-sixth (f), to any of the materials in Exhibits A through D.[8]
2. Reports of Rape and Sexual Assault
Captain Higgins next maintains that the materials in Exhibit A and those referenced in Exhibit B are protected from disclosure under G.L.c. 41, §97D. That statute reads in pertinent part:
All reports of rape and sexual assault or attempts to commit such offenses and all conversations between police officers and victims of such offenses shall not be public reports and shall be maintained by the police departments in a manner which will assure their confidentiality.
Many of the materials referenced in Exhibits A through D fall within the arguably broad category of documents requested by North Star, that is, “witness statements concerning or relating to allegations of sexual abuse by or against any official, member, or employee of the Springfield Diocese.” Among the materials in Exhibit A, however, the following 25 statements do not constitute or contain reports of rape or sexual assault and therefore are not in any way affected by G.L.c. 41, §97D: 1, 4, 5, 6, 7, 8, 9, 10, 11, 15, 18, 19, 20, 21, 22, 25, 26, 28, 29, 31, 32, 33, 35, 36, 37, and 38.
Of the remaining statements in Exhibit A, several contain reports of sexual assault which were dated before September 1993 and are among the redacted documents made public under the modification order. As to all of the materials containing reports of sexual assault or rape, the public records law requirement that they not be made available for public inspection does not bar North Star’s access to them under the discovery provisions of the Massachusetts Rules of Civil Procedure. North Star is not seeking these records to make them available for public inspection, but rather subject to discovery in civil litigation which arises out of the sexual abuse to which the records apply. In these circumstances, G.L.c. 41, §97D, does not proscribe disclosure of these records in a civil action under a court order enforcing a subpoena upon a non-party. See Doe v. Lyons, 6 Mass. L. Rptr. 274, 276 (Mass.Super.Ct. Dec. 23, 1996); Doe v. Bright Horizons Children’s Centers, Inc., 8 Mass. L. Rptr. 616, 618 (Mass.Super.Ct., July 2, 1998) (Brassard, J.) (“a statutory requirement [under G.L.c. 41, §97D] that the report be confidential does not mean that any disclosure whatsoever is prohibited . . . [Defendants urge that they are seeking only to make the materials subject to discovery in a civil litigation initiated by the victim of the alleged abuse to which the records apply”). In order to protect the privacy of the victims of sexual assault, however, before providing the defendants with a copy of these materials, the State Police must redact all of the statements in Exhibit A which contain reports of sexual assault or rape so as to conceal all information which identifies the victims of sexual assault (i.e., names, addresses, social security numbers, and family members’ names).
The same conclusions apply to the documents listed in Exhibits B through D. Each of these exhibits lists one or more documents which contain a report of rape or sexual assault to the police or to the Springfield Diocese. All of the documents in Exhibits B and C also appear by their descriptions to be discoverable and responsive to North Star’s subpoena. They shall be produced to North Star in a redacted form to conceal the information identifying the victims of sexual assault. Likewise, the reports of rape and sexual assault *528 in Exhibit D which are not otherwise (as set forth in this decision) shielded from discovery must be redacted to conceal the identity of the victims.
3. Scope and Burdensome Nature of Discovery Request
Captain Higgins asserted, before North Star reduced the scope of its subpoena, that the request for documents is too broad and burdensome. In one respect, he is correct. There is no question that the last group of documents listed in Exhibit D, entitled Search Warrants, is publicly available under the modification order and therefore there is no reason to burden the State Police with producing it to North Star.[9] Otherwise, however, North Star’s narrowed request eliminates the need to produce much of the items listed in Exhibit D, and I find that it is not overly burdensome or broad as to any of the documents in Exhibits A through D.
Under the narrowed request, the documents in Exhibit D which must be produced are the four interviews,[10] the items numbered 1 through 4 under the caption “Miscellaneous Investigations,” and any other materials containing witness statements responsive to North Star’s request which are in those sections of Exhibit D captioned as “Evidence” and “Richard Lav-igne.”
ORDER
For all the foregoing reasons, it is hereby ORDERED that Captain Peter Higgins’s Motion for a Protective Order is ALLOWED as to:
(1) the information in Exhibits A, B, C, and D identifying the victims of sexual assault (i.e., names, addresses, social security numbers, and family relationships); and
(2) the materials listed in Exhibit D under “Search Warrants.”
It is further ORDERED that Captain Higgins may, within 15 days of entry of this Order, provide the Court with a complete copy of the investigative summary dated April 12, 2004, referenced in Exhibit D for in camera inspection in order to determine the applicability of G.L.c. 4, §7, Twenty-sixth (f). If a document is not submitted to the court, it shall not be protected.
As to the remaining materials in Exhibits A through D which are responsive to the narrowed scope of North Star’s request, Captain Peter Higgins’s Motion for a Protective Order is DENIED. It is further ORDERED that Captain Higgins shall, within 15 days of entry of this Order, prepare and provide to North Star a redacted version (to conceal identifying information of sexual abuse victims) of all of those remaining documents.

Captain Higgins’s list of those statements in Exhibit A is nddled with errors, which the Court corrects here to ensure that the parties are clear about what has been provided. Statement 2 is dated November 18, 1994; statement 3 is dated April 4, 2002; and statement 25 is dated April 20, 2000. Both statements numbered 30 are undated. Statement 36 is by a non-victim witness named Edward Ziskowski. The two statements numbered together as 37 are by another non-victim witness, Raymond Zukowski, telling of Lavigne’s presence on the night of the murder at the site where Croteau’s body was later found. At least one page of the handwritten version of this statement, which is not identical to the typed version, is missing. Other errors describing these statements provided to the defendants appear in Captain Higgins’s Response to Defendant’s Subpoena, in which Captain Higgins misidentifies item F, referred to as Witness #23, as it is dated April 4, 2002, not May 4, 2002. Captain Higgins also states in his response that he has provided to the defendants a witness statement dated June 20, 2002, but this is inconsistent with the list of disclosed statements set forth in his motion for protective order, in which the witness statement dated June 20, 2002, was not marked as being given to the defendants.

In The Republican Company v. Appeals Court, 442 Mass. 218, 226-27 (2004), the Appeals Court affirmed an order by Superior Court Justice Peter A. Velis modifying the impoundment of materials submitted in support of a search warrant application dated September 2, 1993 to obtain a blood sample from Lavigne. Judge Velis redacted the materials to protect the privacy of the victims of sexual abuse, and, in the words of the Supreme Judicial Court, did not err in finding that
in light of Lavigne’s long-known status as a suspect in the investigation into Croteau’s death, the three decades of investigation that have passed, the privacy protection available to individual witnesses through redaction of identifting names and addresses, the climate of broad public disclosure of sexual abuse by members of the clergy, the publication of details of the investigation into Croteau’s death that has already occurred, and the mechanisms of voir dire and change of venue that are available to protect Lavigne’s right to a fair trial, the district attorney’s interests in continued impoundment were weakened.

Some of the most recent materials submitted by Captain Higgins do not clearly relate to the murder. Statement 6 of Exhibit A, dated August 6, 2004, does not mention the murder, Lavigne, or sexual abuse, but rather describes conversations among members of the Diocese regarding the destruction of the Diocese’s “private files” concerning priests’ misconduct relating to sex, theft and alcohol. Exhibit D identifies an interview by police of the same witness on August 17, 2004.

Statement 2 describes Lavigne’s relationship with Croteau. Statement 3 mentions Danny Croteau, the murder investigation, and Lavigne’s temper. One of the statements numbered 13 relates to the site where Croteau’s body was found. Statement 17 appears on police stationery and the subject line reads “Added Information to CS#91-108-0900-0277 Homicide of Daniel Croteau in Chicopee.” Statement 24 is by a witness who told police that Lavigne told him that Croteau’s death was an accident but that the same things could happen to the witness, too. One of the statements numbered 27 also describes a threat by Lavigne to hurt the witness if he told anyone about the abuse. Statements 30 and 31 also discuss the Croteau murder.

See statements 25 and 22. The person who gave statement 25 appears to be the sister of a childhood friend of the person who gave statement 22 in 2003.

Exhibit A, Statements 8, 20, 25 and 37. At least four witnesses have told police that they saw Lavigne on the night of the murder either with Croteau or near the site where Croteau’s body was found. One gave his statement on 1991 and the second gave his on September 29, 1993. A third statement, 25, dated April 20, 2000, is in some respects corroborated by another witness (see statement 22), and describes the murder and the disposal of Croteau’s body. In a fourth statement, dated April 14, 2004, a witness told the State Police Detective Unit that in 1972, she had told the then-district attorney about seeing Lavigne at the murder site, but that the district attorney warned her that she could lose her job or have a defamation claim filed against her if what she claimed she saw “got out.”

Although Captain Higgins did not argue that Exhibits B and C contained materials which fall into the mvestigatoiy materials exemption, I find that they do not, for the same reasons articulated above.

In contrast, there is no merit to Captain Higgins’s contention that his office should not have to produce some of the documents identified in Exhibits B through D which the State Police received or generated as a result of the Diocese of Springfield Sexual Abuse Victim Intake Sheets because North Star can obtain some of the information from the Diocese. These documents do not, by their descriptions, appear to be as voluminous as those at issue in the modification order. Moreover, the fact that the State Police generated and received documents due to another entity’s information does not relieve the State Police from its obligation to produce documents in its custody which are responsive to North Star’s request.

These four individuals’ witness statements also appear in Exhibit A and do not indicate that they were victims so as to trigger privacy concerns and require redaction of identifying information in these documents. In Exhibit D, one individual is identified as a victim who was interviewed by police on August 27, 2002. Her statement (number 25) is listed in the log of Exhibit A dated September 27, 2002, but the statement itself bears the date of April 20, 2000, and does not support a characterization of her as a victim, but rather as a witness to the murder.